## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TRANSOURCE PENNSYLVANIA, LLC,   \| | |
|   \| | |
|         *Plaintiff*,   \| | |
|   \| | |
| v.   \| | |
|   \| | |
| GLADYS BROWN DUTRIEUILLE,   \| | |
|   Chairman, Pennsylvania Public   \| | |
|  Utility Commission,   \| | Case No. _____ |
| DAVID W. SWEET,   \| | |
|   Vice Chairman,   \| | |
|   Pennsylvania Public Utility   \| | |
|   Commission,   \| | |
| JOHN F. COLEMAN, JR. and   \| | |
| RALPH V. YANORA,   \| | |
|  Commissioners,   \| | |
|  Pennsylvania Public Utility Commission,   \| | |
|   all in their official capacities,  and the   \| | |
| PENNSYLVANIA PUBLIC UTILITY   \| | |
| COMMISSION,   \| | |
|   \| | |
|         *Defendants*.   \| | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Pennsylvania's electric systems are part of an inter-state regional electric grid covering all or part of 13 states and the District of Columbia.  In order to ensure that this integrated inter-state electric system—referred to as the "transmission"

159431.15

system—provides reliable and efficient electric service throughout the region, the Federal Energy Regulatory Commission ("FERC") has approved a transmission planning process administered by a federally-regulated regional transmission organization known as PJM Interconnection, L.L.C. ("PJM"). Through this process PJM, among other things, identifies new electric transmission lines necessary for efficient and reliable operation of the regional electric system. Transmission owners then build these new transmission lines.

2.      PJM has identified the need for two new transmission lines, running through parts of southern Pennsylvania and into Maryland, in order to eliminate a recurring phenomenon on the regional grid: congestion. When congestion occurs, the efficient flow of electricity across the transmission system is impeded, with consequences including increased wholesale electric prices for customers located behind the congestion point. While congestion can hurt customers anywhere, the customers suffering from the bottleneck identified by PJM are largely located in Virginia, Maryland, and the District of Columbia. The lines that PJM identified as necessary to relieve that congestion would cross from Pennsylvania into Maryland. PJM identified those lines as necessary after years of carefully studying congestion problems and undertaking detailed benefit-cost analyses of potential solutions—all conducted under FERC-approved processes.

2

3.      Based on PJM's determination of need under a process set forth in federally approved tariffs, Plaintiff Transource Pennsylvania, LLC ("Transource PA" or "Transource") entered into a Designated Entity Agreement, also approved by FERC, authorizing it to meet the regional need identified by PJM through the construction of two new electric transmission lines and associated facilities.  Because the new lines would physically extend through Pennsylvania, Transource PA then applied to the Pennsylvania Public Utility Commission ("PAPUC") for a Certificate of Public Convenience granting public utility status, which would allow Transource PA to enter upon land in order to make studies, surveys, tests, soundings and appraisals related to siting the transmission lines.  Subsequently in separate filings, Transource sought PAPUC siting approval of the transmission lines.  The Federal Power Act preserves state authority over siting and construction issues related to projects within each state.

4.      This case is about the PAPUC's attempt to use its intra-state authority over siting and construction to annul a determination of an inter-state and regional need made under federal law.  Rather than engage in a genuine assessment of siting considerations, the PAPUC instead rejected PJM's federally authorized determination of need.  The PAPUC determined that the lines were not needed because eliminating the bottleneck would primarily help out-of-state customers, not in-state Pennsylvania customers.  The PAPUC found that if the lines were built, wholesale energy prices paid by Pennsylvania customers would increase, as energy could more easily flow out of

3

state to customers in Maryland, Virginia, and the District of Columbia who currently pay higher prices. On that "Pennsylvania-only" or "Pennsylvania-also" basis, *see* Exhibit 1 (PAPUC May 24, 2021 Order or "Order") at page 59, the PAPUC denied permission to site the lines in Pennsylvania and revoked Transource's provisional certificate granting it status as a Pennsylvania public utility.

5.     The PAPUC's decision violates two separate constitutional constraints on state action. First, it is preempted. While the Commonwealth enjoys broad authority over siting determinations, that authority does not allow a state to overrule a determination made under federal law that the interstate transmission system needs a new transmission line. The authority claimed by the PAPUC—to deny that a line is needed when the federally authorized transmission planning process has reached a contrary conclusion—improperly second-guesses the result of a federally approved process and is an obstacle to achievement of national policy and FERC's regulatory authority over the inter-state transmission system. If a state can determine that local, parochial interests allow it to reject a regional determination of need, regional transmission planning will be effectively impossible.

6.     Second, the PAPUC's decision violates the dormant Commerce Clause. The dormant Commerce Clause prohibits a state from hoarding a resource for itself and burdening its export to other states for local economic advantage. That is exactly what Pennsylvania has done here. In an effort to keep cheap electricity from flowing out of

state, where it could reach a broader market willing to pay more, the PAPUC blocked the construction of an interstate channel of commerce that would have allowed such flow. The Commerce Clause also bars states from imposing burdens on interstate commerce that substantially outweigh any local benefit. Again, that is exactly what the PAPUC has done here. The Court cannot allow a state to point to the local economic benefits that result from inter-state transmission congestion as the justification for blocking a project needed to alleviate congestion and benefit the entire region by improving the efficiency of the electric grid.

## PARTIES

7.     Plaintiff Transource Pennsylvania, LLC is a limited liability company organized and existing under the laws of Delaware. Transource PA was formed to construct, own, operate, and maintain electric transmission facilities and equipment within the Commonwealth of Pennsylvania.

8.     Transource PA's principal place of business is Columbus, Ohio. Transource PA is a wholly-owned direct subsidiary of Transource Energy, LLC ("Transource Energy"), and the ultimate parent companies of Transource PA are American Electric Power Company, Inc., headquartered in Columbus, Ohio, and Evergy, Inc., headquartered in Kansas City, Missouri.

9.     Defendants Gladys Brown Dutrieuille, David W. Sweet, John F. Coleman, Jr., and Ralph V. Yanora (collectively, "Defendant Commissioners" or the

"Defendants") are Commissioners of the Pennsylvania Public Utility Commission, the Commonwealth of Pennsylvania government agency with jurisdiction over electric transmission line siting and construction certificate applications. The Defendant Commissioners issued the May 24 Order under color of state law and the offices they occupy are responsible for its enforcement. The Defendants are sued in their official capacities, not as individuals.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331, as such claims arise under the Constitution and laws of the United States. Plaintiff Transource PA asserts claims under 42 U.S.C. § 1983, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), and the Constitution of the United States. Plaintiff Transource PA also requests declaratory relief under 28 U.S.C. § 2201 and speedy hearing of this declaratory-judgment action under Fed. R. Civ. P. 57.

11. This Court has personal jurisdiction over Defendants because all Defendants are residents of Pennsylvania and have their principal place of business in this District.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this District in their official capacities and a substantial part of the events giving rise to the claims advanced in this action occurred in this District.

6

159431.15

## STATEMENT OF FACTS

### *Pennsylvania Has Chosen to Enjoy the Advantages of Belonging to the PJM Regional Electric Grid*

13.    PJM is an exclusively federally-regulated Regional Transmission Organization charged with ensuring the reliable and efficient operation of the electric transmission system under its functional control, and with coordinating the transmission of electricity in all or parts of thirteen states and the District of Columbia. PJM's activities are governed by tariffs and rules reviewed and approved by FERC.

14.    Pursuant to state policy, 66 Pa. Cons. Stat. § 2805(a), and longstanding commitment to interstate power pooling, *see Stone v. Pa. Pub. Util. Comm'n*, 162 A.2d 18, 21 (Pa. Super. Ct. 1960), Pennsylvania's utilities have joined PJM, *see* Map of PJM Zones, https://www.pjm.com/library/~/media/about-pjm/pjm-zones.ashx (accessed June 10, 2021).  In addition to participating in regional planning, Pennsylvania utilities have also turned operational control of their transmission facilities over to PJM as a result of that action.

15.    The Commonwealth derives significant benefits from the existence of, and its decision to participate in, the inter-state electric markets and to receive electricity through the inter-state transmission grid, *see* Exhibit 2 (PAPUC December 22, 2020 Recommended Decision or "Recommended Decision") at 70-71, 97; *see also* PJM, *The Benefits of the PJM Transmission System* (Apr. 16, 2019), https://www.pjm.com/-/media/library/reports-notices/special-reports/2019/the-

7

benefits-of-the-pjm-transmission-system.pdf.  The inter-state grid and its transmission lines allow customers throughout the region to be served by lower cost generators located in a wider geographic area, which lowers prices for customers.

16.   The ability of electricity to flow freely across the entire PJM regional transmission network, with the fewest possible constraints, bottlenecks, and losses, lowers wholesale power prices across the region.  Indeed, absent congestion and "line losses" that occur inevitably when energy is transmitted over long distances, prices would be identical in all locations across the region with the lowest possible regional price.  *See* PJM State & Member Training Department, *Locational Marginal Pricing Components* at 5-7 (July 13, 2017).[1]

17.   In contrast, where limitations on transmission capacity create a bottleneck, or "constraint," prices are relatively lower on the side where more low-cost generation is "bottled up" and are relatively higher on the other side to which it cannot freely flow. In effect, consumers located behind the constraint must rely on higher-cost producers located on their side of the constraint in order to meet needs that could be more efficiently met by generators that cannot serve them because of the congestion. *See Congestion*, PJM Glossary, https://www.pjm.com/Glossary.aspx.

---

[1]   Available at https://www.pjm.com/-/media/training/nerc-certifications/markets-exam-materials/mkt-optimization-wkshp/locational-marginal-pricing-components.ashx.

159431.15

18.     As the PAPUC's Administrative Law Judge found: "Congestion occurs when the least costly resources that are available to serve load in a given region cannot be dispatched because transmission facility limits constrain power flow on the system." Recommended Decision at 18 (Finding of Fact # 35).

19.     The excess costs that result from the need to rely on more expensive resources—because cheaper ones are unavailable due to congestion—are known as congestion costs.  It is the "price that represents the inability to use the least expensive generation to meet the electricity demand due to transmission limitations." *See Congestion Costs*, PJM Glossary.

20.     Congestion costs signal a potential transmission planning need.  Their presence indicates that the regional grid is not functioning as efficiently as it could because energy from the lowest cost generators cannot be used to serve customers.  A principal solution is to expand or improve the regional transmission grid to remove the constraints, so that power can flow more freely.

### *Transmission Planning Solutions Are Identified, Studied, and Selected on a Regional Basis According to a Mandatory Federal Process*

21.     In light of the integrated inter-state nature of the regional grid, *see New York v. FERC*, 535 U.S. 1, 31-32 (2002), utilities, customers, and generators across the PJM region engage in coordinated regional transmission planning under FERC regulations to identify needed transmission facilities and upgrades, *see* 18 C.F.R. § 35.34(k)(7) (describing the requirements for Regional Transmission Organizations

9

regarding "planning[] … directing[,] or arranging, necessary transmission expansions, additions, and upgrades").

22.     In Order No. 1000, issued in 2011, FERC addressed the question of how to identify the "more efficient or cost-effective solution to regional transmission needs" by imposing on RTOs a federal "obligation to develop a regional transmission plan" to decide on those solutions for interstate transmission needs rather than relying solely on "solutions identified in local transmission planning processes." *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Federal Energy Regulatory Commission Order No. 1000, 76 Fed. Reg. 49,842, 49,845 (Aug. 11, 2011). These mandatory planning reforms vindicated FERC's federal "statutory obligation to ensure that Commission-jurisdictional services are provided at" just and reasonable "rates, terms, and conditions of service." *Id.* at 49,846-47, 49,851; *see also* 16 U.S.C. §§ 824d, 824e.

23.     Accordingly, with FERC's approval and supervision, PJM conducts the annual Regional Transmission Expansion Plan ("RTEP") process.  *See generally* PJM Operating Agreement, Schedule 6, https://agreements.pjm.com/oa/4771.  The RTEP is an annual planning process that encompasses a comprehensive series of detailed analyses to ensure electric power continues to flow reliably to customers under stringent reliability planning criteria.  The RTEP process also studies the need for projects that could improve market efficiency (*i.e.* reduce congestion costs). The

10

159431.15

overall point of the PJM RTEP process is to "enable the transmission needs in the PJM Region to be met on a reliable, economic and environmentally acceptable basis." PJM Operating Agreement, Schedule 6, section 1.1, https://agreements.pjm.com/oa/4773.

24.     FERC has endorsed the use of benefit cost-analyses in determining the need for transmission upgrades through the PJM RTEP process. FERC has also made clear that the federal ratemaking principle of cost causation was to guide the identification of what counts as a "benefit." *See* Order No. 1000, 76 Fed. Reg. at 49,940-41, 49,942-43. As the D.C. Circuit later observed: "Under that basic tenet, which we have repeatedly embraced, 'costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits.'" *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir. 2014) (citation omitted); *see also id.* at 97 (denying petitions for review of Order 1000).  In Order 1000, FERC directed regional transmission planners like PJM to ensure that their "benefit to cost threshold … must not be so high that transmission facilities with significant positive net benefits are excluded from cost allocation," and found that "a benefit to cost ratio of 1.25 to 1" was "a reasonable ratio." Order No. 1000, 76 Fed. Reg. at 49,940-41.

25.     FERC also directed regional transmission planners to establish a "transparent" methodology "for determining benefits and identifying beneficiaries for a transmission facility." *Id.* at 49,943. Specifically, that identification must show "clearly who is benefitting from, and subsequently who has to pay for, the transmission

11

investment." *Id*.; *see also id.* at 49,937 (providing that "benefits" may include "congestion relief").[2]

26.  FERC also set forth what "cost" means in this context, and made clear that "the entire[ly] prudently incurred cost of a transmission project" (*i.e.* the construction and financing costs of the transmission project itself) is what matters in weighing benefits against costs. *See id.* at 49,939; *see also id.* 49,851-52 (explaining "investment in new transmission facilities" as the costs to be allocated and a reason for FERC's reforms).

27.  As part of its continuing compliance with FERC's Order No. 1000 reforms, in 2014, PJM proposed and FERC accepted tariff provisions providing that a congestion-relieving project below 345 kilovolts (the kind of project that Transource PA seeks to build in Pennsylvania) is cost-justified when the benefits of congestion relief from the project outweigh the costs of building the project by a ratio of at least 1.25 to 1.  *See* PJM Transmittal Letter to FERC in Docket No. ER14-1394-000 at 7, 9 (submitted Feb. 28, 2014) (describing method being proposed) ("PJM ER14-1394 Transmittal Letter")[3]; *see also* Federal Energy Commission Letter Order in Docket No.

_____

[2] *See also* Order No. 1000, 76 Fed. Reg. at 49,938 (even where a transmission provider is not FERC-jurisdictional, if it "makes the choice to become part of the transmission planning region and it is determined … to be a beneficiary of certain transmission facilities selected in the regional transmission plan for purposes of cost allocation," that entity is "responsible for the costs associated with such benefits").
[3]  Available at https://elibrary.ferc.gov/eLibrary/filelist?document_id=14190855& optimized=false.

159431.15

ER14-1394-000 (issued Apr. 23, 2014) (FERC order accepting method that PJM proposed) ("FERC ER14-1394 Letter Order").[4]

28.     Thus PJM, with FERC's approval, looks at the change in power prices that would result in the congested area, and asks whether those prices will decline by at least 1.25 times more than the investment cost of building the project. *See id.*; *see also* PJM Operating Agreement Schedule 6, section 1.5.7(d) (referring to the "Benefit/Cost Ratio Threshold of at least 1.25:1"), https://agreements.pjm.com/oa/4777.[5]  If so, then the customers who will benefit from alleviated congestion (*i.e.* the customers in the constrained area that currently face higher energy prices and stand to receive lower energy prices if the project is built) pay for the cost of the upgrade project. *See PJM Interconnection, L.L.C.*, 152 FERC ¶ 61,187 at P 5 (2015) ("cost responsibility is assigned based on each zone's pro rata share of the sum of the net present values of the changes in load energy payment, considering only the zones in which the net present value of the changes in load energy payment shows a decrease" (footnote omitted)).

---

[4]   Available at https://elibrary.ferc.gov/eLibrary/filelist?document_id=14208389&optimized=false.

[5] *See also* PJM Operating Agreement Schedule 6 at 1.5.7(d) (referring to "economic-based enhancements and expansions for which cost responsibility is assigned pursuant to the Tariff, Schedule 12, section (b)(v)"); PJM Open-Access Transmission Tariff Schedule 12, section (b)(v),  at (ii) and (C) (addressing "cost responsibility for Economic Projects that are Lower Voltage Facilities"), https://agreements.pjm.com/oatt/4424.

29.    To be sure, when transmission congestion is relieved, prices will rise in the areas in front of the constraint, as electricity that previously was confined to that side of the constraint can now flow more freely to other customers on the other side. But the increase in prices in areas in front of the constraint is not treated as a cost in PJM's FERC-approved benefit-cost analysis. *See* PJM ER14-1394 Transmittal Letter at 7, 9; FERC ER14-1394 Letter Order; PJM Operating Agreement Schedule 6, section 1.5.7(d); *see also* Recommended Decision at 23 (Finding of Fact #61) ("When measuring the benefits of a market efficiency project, PJM excludes increased costs that are experienced as a result of constructing that project."). That is because the current suppressed prices in the areas in front of the constraint are not a benefit, but an artifact of an inefficient regional grid in which power cannot flow freely—an inefficiency that transmission planning should attempt to eliminate. As was explained to the PAPUC by a former Chairman of that Commission:

> [N]o customer or group of customers is entitled to lower cost generation created by congestion constraints. When there is a constraint or bottleneck, the wholesale market is not functioning as intended, which results in a disparity of prices in front of and behind the bottleneck/constraint. Customers in front of the bottleneck are paying artificially low prices and customers behind the bottleneck are paying artificially high prices. The so-called "benefits" of congestion, i.e., the fact that customers in front of the constraint are paying lower than competitive prices, are not benefits at all. They are the inefficient and uneconomic consequences of the bottleneck, which are being paid for through higher prices by those customers taking power behind the constraint.[6]

---

[6] Recommended Decision at 71-72 (quoting testimony of James Cawley, Transource St. No. 9, p. 6).

30.     In sum, if a project makes economic sense for the region because the reduction in congestion costs is at least 1.25 times greater than the cost of the project, the project is needed under federal law. *See* PJM ER14-1394 Transmittal Letter at 7, 9; FERC ER14-1394 Letter Order; PJM Operating Agreement Schedule 6, section 1.5.7(d). And FERC has decided that the customers who benefit from the relieved congestion should pay for the projects that relieve it. *See* Recommended Decision at 33 (Finding of Fact #111).[7]   Customers outside of the congested area do not pay to relieve congestion.

### *The State Certification Process Does Not Perform Regional Transmission Planning But Performs Other Functions*

31.     The federally authorized and federally regulated regional transmission planning process administered by PJM does not address questions of *siting* transmission lines.  It does not include a detailed environmental review of particular routes.  Nor does it grant construction permits or authorize transmission owners to use eminent domain proceedings to obtain rights of way.  *See* PJM Operating Agreement, Schedule 6, section 1.5.3(g) (Scope of Studies) (reflecting PJM's focus on "system

---

[7] This finding reads:

> The costs to construct the IEC Project must be collected from load-serving entities in the transmission zones that do benefit from this project, *i.e.* load-serving entities in Virginia, Maryland, Washington D.C., and Western Pennsylvania. Transource St. 8-R, Exh. TH3R at 28. The greater a transmission zone benefits from the IEC Project, the more costs that transmission zone is expected to pay. OCA St. 1 at 36-37.

reliability, operational performance, and market efficiency," not construction or environmental concerns), https://agreements.pjm.com/oa/4777.  Those issues are left to state authorities, typically to state public utilities commissions that issue certificates of public convenience and necessity.  *See* 52 Pa. Code § 57.76(a).

32.    State certificate proceedings—at least insofar as they deal with lines addressing a regional or interstate need—typically come after a project is studied and approved for inclusion in the RTEP process, by which time an existing transmission owner or new transmission provider has been selected to build a particular project and has received assurance that it can recover the costs of that project through PJM-collected, federally approved transmission rates.  *See* PJM Operating Agreement, Schedule 6, section 1.7 (Obligation to Build), https://agreements.pjm.com/oa/4779.; *see also* PJM Operating Agreement, Schedule 6, section 1.4(c) (Contents of the Regional Transmission Expansion Plan) ("The Regional Transmission Expansion Plan shall, at a minimum, include a designation of the Transmission Owner(s) or other entity(ies) that will construct, own, maintain, operate, and/or finance each transmission enhancement and expansion and how all reasonably incurred costs are to be recovered."), https://agreements.pjm.com/oa/4776.

33.    The division of authority between state and the federal regulation is also reflected in the PJM Operating Agreement, which tasks entities designated to build particular transmission projects with obtaining "any necessary state or local siting,

159431.15

construction and operating permits" that may be required by relevant jurisdictions. *See* PJM Operating Agreement, Schedule 6, section 1.7(a).

### The IEC Projects Receive a Federal Need Determination via PJM Approval

34.    After study, PJM concluded that power often flows from west to east across facilities in West Virginia and Maryland, but that these facilities have limited capacity.  Consequently, such flow of power often results in congestion and higher effective prices in Maryland, the District of Columbia, and Virginia.  Recommended Decision at 21 (Findings of Fact # 48-50); *id.* at 23 (Finding of Fact #62).  This phenomenon and the related constraints is known as "congestion on the AP South Interface" or "[c]ongestion on the AP South Reactive Interface." Recommended Decision at 21, 72 (citations omitted); *see also id.* at 13 (Finding of Fact #7) (describing the AP South Reactive Interface as "a set of four 500 kV transmission lines that originate in West Virginia and terminate in Maryland").

35.    A corollary consequence of this congestion is lower prices in areas with uncongested access to that generation.  In the case of the congested AP South Interface, too few connections exist between the Pennsylvania and the D.C./MD/VA portions of the grid, effectively trapping lower-cost power in Pennsylvania that would otherwise flow to where it is economically wanted most.  Since that lower-cost power cannot reach D.C./MD/VA, it is consumed in Pennsylvania and is sold at a lower price than it would fetch if its movement was not constrained by insufficient transmission capacity. *See* Recommended Decision at 23 (Finding of Fact # 62); *see also id.* at 81 n.10

17

(estimating the net increase in wholesale power prices the PAPUC administrative law judge expected from project construction).

36.     In October 2014, PJM opened a Long Term Proposal Window ("2014/15 RTEP Long Term Proposal Window") to solicit proposals to address, among other things, transmission congestion constraints in Pennsylvania, Maryland, Virginia, and West Virginia.[8]

37.     In response to that solicitation, Transource Energy, the parent of Transource PA, submitted "Project 9A," known also as the Independence Energy Connection Project. That project proposal aimed to alleviate transmission congestion constraints and provide reliability benefits in Pennsylvania, Maryland, West Virginia, and Virginia. It included two transmission project segments and associated facilities that would be located in Pennsylvania and connect to facilities in Maryland. These segments involved the construction of two new overhead double-circuit 230 kilovolt (kV) interstate transmission lines, the Rice-Ringgold 230 kV Transmission Line or the Independence Energy Connection-West Project ("IEC-West Project"), and the Furnace Run-Conastone 230 kV Transmission Line or the Independence Energy Connection-East Project ("IEC-East Project") (collectively, the "IEC Project" or "IEC Projects").

_____

[8] *See generally* PJM, LLC, *PJM RTEP - 2014/15 RTEP Long Term Proposal Window Problem Statement & Requirements Document*, Version 2 (Oct. 30, 2014) (soliciting proposed solutions), https://www.pjm.com/planning/-/media/planning/rtep-dev/expan-plan-process/ferc-order-1000/rtep-proposal-windows/2014-15-rtep-long-term-proposal-window-problem-statement-and-requirements-document.ashx.

38. An approximate map of the location of the intended IEC Projects was produced by PJM and presented to the PAPUC:[9]

**Figure 1: IEC Projects**



_____

[9] Transource Pennsylvania ("TPA") Exhibit No. TH-5R: PJM White Paper, Transource Independent Energy Connection Market Efficiency Project at 3 (November 15, 2018). The greater Baltimore metropolitan area is located in the bottom right corner of the above map. This document is also available online at https://www.pjm.com/-/media/committees-groups/committees/teac/20181108/20181108-transource-white-paper.ashx.

159431.15

Another map describing the general effect the IEC Projects are intended to have on congestion was presented to the PAPUC by a witness that works at PJM:[10]

**Figure 2: Impact of IEC Projects on AP South Reactive Interface**



39.    Consistent with its federally approved tariff, PJM performed a benefit-cost analysis on each project submission to determine whether the new facilities can lower costs to customers, and whether the benefits of the project exceed its costs by the ratio of 1.25 to 1 over 15 years. *See* PJM OA Schedule 6, Section 1.5.7(d). After

---

[10] Transource Pennsylvania Amended Application Rejoinder Testimony of Timothy Horger, Statement No. 3AA-RJ at 9, Docket No. A-2017-2640195 *et al.* (Pa. Pub. Util. Comm'n July 8, 2020).

159431.15

evaluation and review of the IEC Projects, PJM approved 'Project 9A' on August 2, 2016.[11]

40.    As the PJM tariff provides and the PAPUC understood, "[t]he cost of a market efficiency project is defined as the present value [of a transmission owner's] revenue requirement that *benefitting* transmission zones would be expected to pay over a period" associated with the project, and the benefit-cost analysis "excludes the change in net load payments for transmission zones that would see an overall increase as a result of constructing the market efficiency project." Recommended Decision at 20 (Findings of Fact # 45-46) (citations omitted and emphasis added). Put another way, as PJM measures "the benefits of a market efficiency project" generally (here, "the benefits of the IEC Project"), PJM does not factor in "the higher costs that would result in other regions (including Pennsylvania)" when constraints inhibiting the flow of "lower-cost power" are removed. *See id.* at 23 (Findings of Fact # 61-62).

41.    PJM and Transource PA subsequently executed a Designated Entity Agreement regarding Transource's rights and responsibilities related to the IEC Project, which was presented to and approved by FERC in January 2017,[12] after

_____

[11] In the parlance of the PJM RTEP process and Operating Agreement, the project was approved as Baseline Upgrade Numbers b2743 and b2752. *See* Recommended Decision at 14 (Finding of Fact #10).

[12] *See* Recommended Decision at 14 (Finding of Fact #11); *PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,021 (2017).

approval of PJM's regional cost allocations for the project.[13] Transource PA also became a transmission owner in the PJM territory in anticipation of the IEC Project and established a FERC-approved transmission formula rate enabling future recovery through rates of the costs of building and maintaining the IEC Project. *See PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,089 (2017).

### With Federal Need Approval In Hand, Transource Applies for State Siting Authority

42. Following the approvals received at PJM and at FERC, in December 2017 Transource PA moved to the next step in the transmission project approval and construction process: applying for siting approval before the PAPUC.  Recommended Decision at 15 (Findings of Fact # 15-18).  Although the Federal Power Act assigns authority over regional transmission projects and interstate transmission needs to FERC, it preserves state authority over siting and construction issues related to those projects.  *See New York*, 535 U.S. at 18-22 (explaining that 16 U.S.C. § 824 contains a "'clear and specific grant of jurisdiction' to FERC" over interstate transmission service and rates but "reserve[s] state powers" over other matters); *S.C. Pub. Serv. Auth.*, 762 F.3d at 62 (explaining that FERC transmission service and rate regulation does not

---

[13] *See* Recommended Decision at 101; *see also PJM Interconnection, L.L.C.*, 157 FERC ¶ 61,152 (2016) (accepting cost responsibility assignments approved by PJM Board in August 2016).

159431.15

"intrude on the States' traditional role in regulating siting and construction" of transmission lines).

43.     In 2018, Transource received a provisional grant of a certificate of public convenience ("certificate" or "CPC") that allowed it to become a public utility in Pennsylvania, and begin project activities, pending full consideration of the need for and qualifications of the project. *See* Order at 6, 20-21, 71.  Under the authority of the provisional CPC, Transource had the authority to assess potential project lands, conduct environmental studies, and conduct appraisals.

44.     In 2019, Transource reached a settlement with the incumbent electric utility and local government and citizens in York County, Pennsylvania regarding the siting of the IEC East portion of the project. Recommended Decision at 17 (Finding of Fact # 24).  That settlement provided that the lines to be constructed for the IEC East portion of the project will be placed on existing towers or in existing right of ways with less need for right of way expansion and tree clearance, affecting fewer landowners and fewer natural resources and yielding less overall environmental impact. *See id.* at 17-18 (Findings of Fact # 24-34).

### The PAPUC Disregards The Federal Determination Of Need

45.     As part of the state process to receive a certificate of public convenience and necessity granting siting approval, the PAPUC must decide under 66 Pa. Cons. Stat. § 1501 whether proposed "improvements in or to" transmission "facilities" are

23

"necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public." *See also* Order at 21-22. PAPUC regulations require the Commission to make four findings to satisfy this statute:  First, that "there is a need for" the transmission line; second, that the transmission line "will not create an unreasonable risk of danger to the health and safety of the public"; third, that the transmission line is "in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth"; and fourth, that the line "will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives." 52 Pa. Code § 57.76(a).

46.     After extensive testimony, discovery, and six days of evidentiary hearings explored the details of the IEC Projects, a Recommended Decision was issued on December 22, 2020 by a PAPUC Administrative Law Judge. *See* Recommended Decision at 134 and Appendix B.  That Recommended Decision focused on the "need" portion of the certificate analysis, and in particular on the consequences for Pennsylvania customers if the projects were built.  *See id.* at 82, 86, 96, 124

47.     Dismissing PJM's project-specific benefit cost analysis and need determination, *see id.* at 97, the Recommended Decision found that the PAPUC "has the exclusive jurisdiction over both whether the proposed transmission infrastructure is needed and where it should be built," and further found that the question of whether

"the proposed facility is 'necessary or proper'" under state law at 66 Pa. Cons. Stat. § 1501 is "fully within the discretion of the [PAPUC] under Pennsylvania law" despite the "regional needs" that PJM may have identified under federal law.  Recommended Decision at 82-83, 86.

48.     The Recommended Decision found that "no need has been proven for Project 9A" based on (1) a finding under state law that "the IEC Project as a market efficiency project does not provide sufficient benefits to Pennsylvania"; and (2) a finding that PJM was wrong to conclude that the project provided "sufficient benefits to … the PJM region as a whole." *Id.* at 97, 124.  Hence, the Recommended Decision found that the requested certificate should be denied.

49.     In response, Transource brought its exceptions to the Recommended Decision before the full PAPUC, explaining in detail how the Recommended Decision misinterpreted FERC's Order No. 1000, the meaning and weight of the PJM regional transmission planning process and decision on Project 9A, and the remaining role left for the PAPUC under state law in this context. *See* Exceptions of Transource Pennsylvania, LLC and PPL Electric Utilities Corp. at 7-31, Docket No. A-2017-2640195 *et al.* (Pa. Pub. Util. Comm'n Jan. 12, 2021), https://www.puc.pa.gov/pcdocs/1689967.pdf.

25

50.     The PAPUC, however, affirmed and adopted the Recommended Decision in its Order, holding that state law authorized it to evaluate "need" and to reach a conclusion at odds with PJM's federally regulated planning process.

51.     Regarding the PAPUC's authority, the Order found that "[t]o the extent Transource[] … asserts or implies that federal jurisdiction controls questions of need for state approval of the PJM-approved regional transmission project, we reject Transource's position. We agree with the ALJ … [and others] that the issue of whether the element of 'need' for Project 9A is satisfied, is matter falling under this Commission's jurisdiction and discretion to approve siting applications under the Code, Commission Regulation at 52 Pa. Code § 57.76(a)(1) and relevant caselaw." Order at 54.

52.     Although the Order found "PJM's methodology and process for selection of Project 9A … relevant" to the PAPUC's analysis, it averred that this determination "in no way replace[s] the Commission's independent authority" regarding project "'need' under 52 Pa. Code § 57.76(a)(1)" in certificate proceedings. Order at 55; *id.* at 63 ("we find that the ALJ properly construed the state versus federal roles regarding regional transmission planning in the analysis and application of the relevant statutory authority, applicable regulations, and case law to the present case").

26

53.    In reaching this conclusion, the PAPUC explicitly found that its authority had not been preempted or supplanted by the federal regional transmission process and its determination that the IEC Projects met a regional need:

> We expressly reject any argument that the authority granted by the Pennsylvania Legislature to this Commission under the Code, including the power to apply Commission Regulations in the present circumstances, is preempted by the federal power pursuant to which PJM conducts its selection process for regional transmission planning purposes, including Project 9A.  To the extent Transource argues that this Commission is prohibited from rendering an independent determination of "need" for Project 9A, which may find that the weight of the evidence does not support a determination of "need" for the proposed project, pursuant to 52 Pa. Code § 57.76(a)(1), despite PJM's selection of the project for regional planning purposes, we disagree.

> Contrary to Transource's asserted position, the federal authority under which PJM operates does not extend beyond PJM's approval process, where approval is sought from a state commission.  PJM approval for a project, including Project 9A, does not guarantee approval for siting and construction of transmission lines within the borders of the sovereign Commonwealth of Pennsylvania.[14]

54.    This fact, in the PAPUC's view, allowed it conclude that while the project is indisputably necessary or proper to meet regional needs as exclusively determined by PJM, Transource also had to prove that building the project was economically advantageous on a "Pennsylvania-also" basis in order to receive state approval:

> With respect to consideration of the potential negative impact, including rate increases, to the customers in the Commonwealth, Transource asserts that this Commission is required to disregard such negative impact and weigh only the assertion of "need" for the proposed project as calculated under the PJM-approved criteria and methodology.  We disagree.  The potential negative and practical impact on the citizens and consumers of

---

[14] Order at 56-57.

Pennsylvania is our concern, and it is properly within the scope of our consideration of the weight of all the evidence on the issue of "need."

Transource does not dispute that the consequences of Project 9A would be to alleviate the economic congestion on a regional level, which in turn would result in higher rates in Pennsylvania. Transource argues only that, whatever the negative impact to Pennsylvania consumers is superseded by the regional planning needs to be achieved under Project 9A. Transource maintains that, as Pennsylvania benefits from regional planning for projects approved here and elsewhere, Pennsylvania should also accept the negative consequences and not review the question of need on a "Pennsylvania only" basis.

However, contrary to Transource's view, the ALJ did not view the question of need on a Pennsylvania-only basis, but rather viewed the regional planning proposal on a "Pennsylvania-also" basis, in that the review included consideration of the importance of prospective federal regional planning objectives and the importance of prospective impact upon the Commonwealth.[15]

55.     The PAPUC then decided that, in its view, a determination of "need" should account for the likelihood that PA customers will experience higher wholesale power costs once the line is constructed, because of the alleviation of congestion that is currently trapping electricity in Pennsylvania. *See* Order at 59; *id.* at 60 (identifying "the result of" the IEC Projects' construction as "a substantial increase in utility rates within the Commonwealth").

56.     According to findings by the ALJ and adopted by the PAPUC, PJM's benefit-cost analysis was flawed because PJM's methodology did not take into account the higher prices that PA customers would experience once the line was built. The

---

[15] Order at 59.

Recommended Decision had found that if the benefit-cost analysis was recalculated to include the estimated "net increase of approximately $400 million in wholesale power prices from construction of the IEC Project" in Pennsylvania and similar increases elsewhere, then "the IEC Project will only provide net economic benefits of $32.5 million over a period of 15 years." Recommended Decision at 81 n.10, 95, 97; *see also id.* at 98 (discussing "PJM's failure to consider increased wholesale power prices in Pennsylvania when calculating the benefit-cost ratio").

57.    The Recommended Decision also found that "the benefit-cost ratio of the IEC Project is deficient when measured against the constitutional, statutory, and regulatory standards of Pennsylvania law" even though PJM found it sufficient to meet "the requirements set forth in PJM's Operating Agreement and manuals." *See id.* at 98 (footnote omitted). The PAPUC agreed, finding that it could give weight to "impact which may or may not be part of the PJM approval criteria and methodology," Order at 58, that it "agree[d] with the ALJ's analysis of the weight of the evidence," *id.* at 61, and that "the ALJ properly construed the state versus federal roles regarding regional transmission planning in … the present case," *id.* at 63.

58.    The PAPUC thus disregarded and acted directly contrary to the federally approved methodology used by PJM in assessing whether there is a regional need for new transmission, and applied a different methodology of its own, focused on local impacts, to conclude that the line was not needed.

59.    In contrast, the Maryland Public Service Commission, in reviewing the siting application for the portion of the line that would extend into Maryland, rejected the notion of a Maryland-focused need determination as inconsistent with federal law: "Although Alternative Project 9A exceeds the FERC Order No. 1000 benefit/cost threshold, [Maryland's consumer advocate] takes issue that—on a Maryland benefits-to-cost basis—the project fails to satisfy the 1.25 Benefit/Cost ratio… [That] is of no consequence with regard to Alternative Project 9A, which—pursuant to FERC Order No. 1000 and PJM's Tariff—must be evaluated on a regional, not on a state-specific basis."[16]

60.    Because PJM operates a transparent public process for transmission planning needs as directed by FERC, if the PAPUC believed that PJM's study and determination of need was factually in error, or that PJM misapplied FERC-approved policies, or that subsequent developments and data should have resulted in a different, lower benefit to cost ratio result, the PAPUC could have raised those concerns with PJM in the RTEP process. *See* PJM Operating Agreement, Schedule 6, section 1.3 (addressing the Transmission Expansion Advisory Committee and its openness to "the electric utility regulatory agencies within the States in the PJM Region"),

---

[16] *In re the Application of Transource Maryland LLC for A Certificate of Pub. Convenience & Necessity to Construct Two New 230 Kv Transmission Lines Associated with the Indep. Energy Connection Project in Portions of Harford & Washington Cntys., Maryland*, No. 89571, 2020 WL 3977589, at *41 (¶ 142) (Md. Pub. Serv. Comm'n June 30, 2020).

30

https://agreements.pjm.com/oa/4775.  Upon information and belief drawn from Transource's participation in those public processes, no such effort was ever made.

61.    The PAPUC likewise could have taken its concerns to FERC, where it would have the right to file a complaint alleging that the terms of PJM's Operating Agreement, PJM's specific decision on Project 9A, or PJM's annual reassessments of its analysis since 2016 were unjust and unreasonable under the Federal Power Act. *See* 16 U.S.C. §§ 824e(a), 825e.  PJM clearly determined the IEC Projects to be needed and found that under PJM's methodology the "benefit-cost ratio for Project 9A has always exceeded 1.25," Recommended Decision at 67, the number required for PJM approval, *see* PJM Operating Agreement, section 1.5.7(d), https://agreements.pjm.com/oa/4777.  Pennsylvania could not, however, forsake the established federal dispute resolution processes and instead set a different and more onerous standard under state law for the same question.

62.    Because the PAPUC's Order found that Transource's application could not meet the required "need" showing, the PAPUC decided that the remaining issues raised by the application were "moot and shall not be addressed" by the full PAPUC. Order at 63-64.

63.    Based on its "need" determination, the PAPUC also "direct[ed] that the Certificate of Public Convenience issued to Transource Pennsylvania, LLC, by the

31

January 23, 2018 Opinion and Order be rescinded." Order at 71-72; *see also id.* at 74-75, 80.

64.    Under Pennsylvania law, the PAPUC's order had immediate effect and is in force today, *see* 66 Pa. Cons. Stat. § 316, meaning that Transource is no longer a Pennsylvania-authorized public utility.  Thus, Transource is no longer authorized to access lands for project assessment or to conduct appraisals.

65.    Transource PA faces the prospect of imminent and irreparable harm as a result of the PAPUC's order.  Under its Designated Entity Agreement, Transource PA is required to acquire all state permits by September 30, 2021.  A failure to meet that milestone date constitutes a breach of the agreement, which could result in the elimination of Project 9A from the Regional Transmission Expansion Plan and the termination of the agreement.

## COUNT I – PREEMPTION
### (*Ex Parte Young*; 28 U.S.C. § 2201)

### *The PAPUC Cannot Use State Law to Override a Federal Determination of a Regional Electric Transmission Infrastructure Need*

66.    The allegations contained in paragraphs 1-65 above are incorporated as if restated fully herein.

67.     Section 201(a) of the Federal Power Act vests FERC with authority to regulate "transmission of electric energy in interstate commerce."  16 U.S.C. § 824(a).  The transmission planning process effort is governed by federal law and is "squarely

159431.15

within [FERC's] jurisdiction." Order No. 1000, 76 Fed. Reg. at 49,862.  That is so notwithstanding the "States' traditional role in regulating siting and construction." *S.C. Pub. Serv. Auth.*, 762 F.3d at 62.

68.    Under Section 205 of the Federal Power Act and Order No. 1000, FERC must approve all PJM processes affecting the rates, terms, and conditions of electric transmission in interstate commerce. *See* 16 U.S.C. § 824d(a)-(e).  Moreover, because the tariffs of entities like PJM are approved by FERC under federal law, those tariffs pre-empt contrary state regulations.  *See Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003) (rates on file with FERC "must be given binding effect by state utility commissions" because "[w]hen the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause" (internal quotation marks omitted)); *id.* at 49-50 (FERC-approved tariffs still have preemptive force even where FERC has "delegated discretion" to the implementing utility).

69.    Here, FERC has exercised its authority by approving a comprehensive regional transmission planning process for PJM, reflected in the PJM Operating Agreement, which contains a precise methodology for determining, at the regional level, whether a particular new line is needed.  *See* PJM Operating Agreement Schedule 6 at section 1.5.7(d); *see also* PJM Open Access Transmission Tariff Schedule 12, section (b)(v) at (ii) and (C); PJM ER14-1394 Transmittal Letter at 7, 9. PJM's process results in a "single plan" that "consolidate[s] the transmission needs of the region" as

a whole using a federally approved methodology, PJM Operating Agreement, Schedule 6, section 1.4(a), https://agreements.pjm.com/oa/4776.   This policy is part of how FERC has decided to "fulfill our statutory obligation to ensure that Commission-jurisdictional services are provided at rates, terms, and conditions of service that are just and reasonable and not unduly discriminatory or preferential." Order 1000, 76 Fed. Reg. at 49,846, 49,940-41.

70.    The PAPUC, however, disregarded the FERC-approved methodology, applied a different and incompatible methodology for weighing costs and benefits, and reached a contrary need determination in opposition to that reached by PJM under federal law.

71.    The PAPUC's order frustrates the federal process for determining what transmission projects are needed.   The PAPUC has interpreted state law to give it a veto over regional congestion-relieving market efficiency projects that it believes do not sufficiently benefit in-state interests—a veto that neither PJM nor FERC has permitted the PAPUC to exercise.   Based on this veto, Pennsylvania seeks to demand that transmission developers demonstrate that building their project will not disturb the status quo economic advantages enjoyed by in-state wholesale customers (which Pennsylvania believes those customers should keep, even though FERC and PJM have determined otherwise).

72.    Whether termed a "Pennsylvania only" or "Pennsylvania-also" approach, *see* Order at 59, the PAPUC has clearly attempted to make transmission developers prove an additional element for project need under state law that is not required under federal law, and to require that showing even after the transmission developer has already received a federally sanctioned determination that its project is indeed necessary for interstate transmission service in the region.

73.    The PAPUC's decision is in direct conflict with federal law and factual determinations made under federally regulated and approved processes and standards. The PAPUC's decision is an obstacle to the achievement of both PJM's and FERC's objectives regarding the transmission projects that the PJM region needs. The PAPUC's decision is unlawful because states are not at liberty to review, revise and overturn federal determinations of interstate wholesale electric transmission needs.[17]

74.    Moreover, even when states act within the scope of their reserved authority, they may not use that authority to target particular federal policies with which

---

[17] *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 969 (1986) ("FERC's allocation of entitlement power to Nantahala is therefore reflected in Nantahala's filed rates. NCUC cannot substitute its own conception of what allocation of entitlement power would have been memorialized in a fair AA simply because FERC did not approve the AA without qualification."); *New York*, 535 U.S. at 22 ("a mere 'policy declaration'" in Federal Power Act Section 201 regarding respect for reserved state powers "'cannot nullify a clear and specific grant of jurisdiction'" over transmission service and associated needs (citation omitted)); *see also* 16 U.S.C. § 824(a) (establishing exclusive "Federal regulation of matters relating to … the transmission of electric energy in interstate commerce"); *id* § 824(b)(1) ("The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce").

they disagree and nullify those policies. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). State action is preempted when it "attempt[s] to 'regulate in areas where FERC has properly exercised its jurisdiction'" or when it results in "'unavoidable conflict between' state regulation" and federal regulation. *Id.* at 389-90 (citing *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 374 (1988) and *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621 (1972)). The PAPUC's action here does both, in an attempt to undo what PJM and FERC have done regarding the IEC Projects and the standard they must meet.

## COUNT II – DORMANT COMMERCE CLAUSE
### (42 U.S.C. § 1983; 28 U.S.C. § 2201)

*Under Controlling Supreme Court Precedent, Pennsylvania Cannot Use Its State Regulatory Authority to Deliberately Restrict the Flow of Lower-Cost Power to Preserve Economic Advantages for In-State Customers*

75.     The allegations contained in paragraphs 1-74 above are incorporated as if restated fully herein.

76.     Only Congress may "regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3.  Interstate electric transmission lines are channels or instrumentalities of interstate commerce, *see* 29 C.F.R. § 776.29, over which power actually flows according to system dynamics and conditions, not state lines.  Thus electric "transmission is inherently interstate," especially regarding "interconnected transmission lines that cross state lines." *New York*, 535 U.S. at 31-32 (citations omitted).

77.     In denying that Pennsylvania had a "need" for the IEC Projects—which would establish two additional interstate connections between elements of the PJM-run grid in Pennsylvania and in Maryland—the PAPUC explicitly based its finding on the unwelcome expected economic results for Pennsylvania customers from installing those additional interstate connections.  *See* Order at 59.

78.     At its core, the PAPUC's Order decides that because the current configuration of transmission facilities leads to relatively lower prices for many Pennsylvania customers, and because the construction of the IEC Projects would relieve the constraints that make a good deal of those economic advantages possible, the PAPUC can use its certificate authority to maintain the status quo and refuse additional connections with Maryland for in-state economic reasons.

79.     This explicit attempt at local protectionism is flatly inconsistent with the dormant Commerce Clause.  Local protectionism is impermissible regardless of whether the State seeks to close its borders to imports, *e.g.*, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 628 (1978) (state statute banning import of out-of-state waste invalid under dormant Commerce Clause), or prevent exports, *see Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 4 (1928) ("A state is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the state.").  States are not permitted, under the dormant Commerce

37

Clause, to prevent interstate commerce in order to hold onto an in-state economic advantage.

80.    Nor are States permitted to mandate "that [their] residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 (1982) (collecting cases).

81.    In the power exports context in particular, where a state commission "has made clear that its order is designed to gain an economic advantage for [in-state] citizens at the expense of … customers in neighboring states" it has engaged in "precisely the sort of protectionist regulation that the [dormant] Commerce Clause declares off-limits to the states." *Id.*

82.    Here, the PAPUC has reserved to Pennsylvania customers the economic advantage supplied by current constraints on the interstate PJM-run electric transmission network.  No federal policy supports or endorses the use of state authority to block commerce with other states or refuse the improvement of the regional electric grid simply because, in the view of a particular state, the in-state economic status quo is preferable to expanding commerce across state lines.  The PAPUC's action here is thus unlawful and inconsistent with the dormant Commerce Clause.

***Pennsylvania Cannot Use Its State Regulatory Authority
to Impose a Burden on Interstate Commerce That Is
Wholly Excessive Compared to the Putative Local Benefits***

83.    Pennsylvania's interest in the policy embodied by the Order is not legitimate and the burden imposed on interstate commerce by that policy plainly exceeds the local benefits.  *See Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

84.    Pennsylvania made the choice to allow its utilities to join PJM, and it has reaped the benefits of being part of an integrated regional market.  A consequence, however, is that the state has chosen to subordinate its police power interests in determining the need for new transmission projects to PJM's determination of regional needs.  Pennsylvania cannot claim a legitimate in-state interest in preserving a price disparity that the regional transmission planning scheme regards as an inefficiency that should be eliminated in order to maximize regional benefits.

85.    Here, after lengthy and detailed study, the FERC-approved regional transmission planning process determined that building the IEC Projects would meet a need and reduce congestion on the PJM-operated network.  Yet instead the PAPUC now requires that projects like the IEC Projects must meet a "Pennsylvania-also" standard regarding "need" that requires that the project economically benefit in-state customers, and that those in-state interests take precedence over the interests of the region as a whole.

39

159431.15

86.    If the PAPUC's Order is allowed to stand, the federal regional transmission planning process would be significantly burdened.   The enormous regional benefits to be obtained from interstate electric transmission planning would be subject to veto by state regulators anytime those state regulators conclude that alleviating transmission congestion may raise prices for in-state customers.

87.    The burden that Pennsylvania's plan imposes on interstate commerce is wholly excessive compared to putative local benefits, to which Pennsylvania residents, as participants in a regional transmission grid, have no entitlement.

## REQUEST FOR RELIEF

a.     In light of the above facts and claims, Transource PA requests that this Court enter a declaratory judgment that the PAPUC's determination that the IEC Projects are not needed is preempted and has no force or effect under the Supremacy Clause of the United States Constitution, art. VI, cl. 2.

b.     Transource PA requests that this Court enter a declaratory judgment that the PAPUC's determination that the IEC Projects are not needed is unlawful under the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3.

c.     Because time is of the essence and because without resolution of this controversy the IEC Projects are at risk of being removed from the PJM Regional Transmission Expansion Plan, Transource requests speedy hearing of this declaratory-judgment action under Fed. R. Civ. P. 57.

159431.15

d.      Transource PA also requests that this Court enter an injunction prohibiting enforcement of the PAPUC's Order, including its directive rescinding the Certificate of Public Convenience issued to Transource Pennsylvania LLC by the January 23, 2018 PAPUC Opinion and Order. *See* Order at 71-72, 80. Transource PA faces the prospect of imminent and irreparable harm resulting from a failure to meet its September 30, 2021 deadline under its Designated Entity Agreement to obtain all state permits.  Such a failure would constitute a breach of the agreement and allow PJM to remove the project from the Regional Transmission Expansion Plan.  The PAPUC's Order not only rescinds Transource PA's Certificate of Public Convenience, but also could have the consequence of threatening Transource PA's ability to maintain its environmental permits.  Transource PA is also now unable to exercise eminent domain on the parcels needed to construct the line, threatening its construction timeline even if the Certificate of Public Convenience is granted by September 30, 2021.

e.      Transource PA requests such other and further relief as the Court may deem just and proper, including attorneys' fees pursuant to 42 U.S.C. § 1988.

159431.15

June 22, 2021                             Respectfully submitted,


/s/ *Matthew E. Price*                    /s/ *James J. Kutz*
Matthew E. Price (DC ID # 996158)         James J. Kutz (PA ID #21589)
(*Pro Hac Vice* to be filed)              Anthony D. Kanagy (PA ID # 85522)
Zachary C. Schauf (DC ID # 1021638)       (*Pro Hac Vice* to be filed)
(*Pro Hac Vice* to be filed)              Erin R. Kawa (PA ID # 308302)
JENNER & BLOCK LLP                        Lindsay A. Berkstresser (PA ID #
1099 New York Ave. NW                     318370)
Suite 900                                 Post & Schell, P.C.
Washington, DC  20001-4412                17 North Second Street
(202) 639-6873                            12th Floor
mprice@jenner.com                         Harrisburg, PA 17101-1601
zschauf@jenner.com                        Phone: (717) 731-1970
                                          jkutz@postschell.com
                                          akanagy@postschell.com
E. Glenn Rippie (IL ID # 60654)           ekawa@postschell.com
(*Pro Hac Vice* to be filed)              lberkstresser@postschell.com
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654                  Hector Garcia-Santana (VA ID #
(312) 222-9350                            48304)
grippie@jenner.com                        (*Pro Hac Vice* to be filed)
                                          AMERICAN ELECTRIC POWER
                                          SERVICE CORPORATION
                                          1 Riverside Plaza, 29th Floor
                                          Columbus, OH  43215
                                           (614) 716-3410
                                          hgarcia1@aep.com


*Counsel for Plaintiff Transource Pennsylvania, LLC*

42

159431.15