## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRANSOURCE PENNSYLVANIA, LLC, | \| | |
| | \| | |
| *Plaintiff*, | \| | |
| | \| | |
| v. | \| | |
| | \| | |
| GLADYS BROWN DUTRIEUILLE, | \| | |
|   Chairman, Pennsylvania Public | \| | |
|  Utility Commission, | \| | Case No. 1:21-cv-01101-JPW |
| DAVID W. SWEET, | \| | (Judge Jennifer P. Wilson) |
|   Vice Chairman, Pennsylvania Public | \| | |
|   Utility Commission, | \| | |
| JOHN F. COLEMAN, JR. and | \| | |
| RALPH V. YANORA, | \| | |
|   Commissioners, Pennsylvania Public | \| | |
|   Utility Commission, | \| | |
|   all in their official capacities,  and the | \| | |
| PENNSYLVANIA PUBLIC UTILITY | \| | |
| COMMISSION, | \| | |
| | \| | |
| *Defendants*. | \| | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................4

QUESTIONS INVOLVED................................................................9

ARGUMENT ...................................................................................9

I.   The Federal Need Determination Preempts The PAPUC's Contrary
     Decision. ...............................................................................9

     A.   The PAPUC's Decision Directly Conflicts With Federal Law. .........10

     B.   The PAPUC's Decision Is An Obstacle To Federal Objectives. ........13

     C.   The PAPUC's Order Is Not A Valid Exercise Of Its Siting
          Authority. ......................................................................15

II.  The PAPUC's Decision Violates The Dormant Commerce Clause. ............17

     A.   The PAPUC's Decision Is Discriminatory And Thus *Per Se*
          Invalid..........................................................................18

     B.   The PAPUC Burdens Commerce In A Manner Disproportionate
          to Any Legitimate Local Benefits. ....................................20

CONCLUSION ...............................................................................23

# TABLE OF AUTHORITIES

## CASES

*Alliant Energy Corp. v. Bie*, 330 F.3d 904 (7th Cir. 2003) ....................................21

*Appalachian Power Co. v. Public Service Commission of West Virginia*, 812 F.2d 898 (4th Cir. 1987) ...............................................12

*Cahnmann v. Sprint Corp.*, 133 F.3d 484 (7th Cir. 1998) ......................................10

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Marketing Board*, 298 F.3d 201 (3d Cir. 2002) .......................................17, 19, 20

*Entergy Louisiana, Inc. v. Louisiana Public Service Commission*, 539 U.S. 39 (2003)...............................................................10

*Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cir. 2010).........................................9, 13, 14

*Florida Transportation Services, Inc. v. Miami-Dade County*, 703 F.3d 1230 (11th Cir. 2012)...........................................................21

*Lebanon Farms Disposal, Inc. v. County of Lebanon*, 538 F.3d 241 (3d Cir. 2008) ...........................................................21

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)...............................................................12

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986).................12, 14

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982).................19, 20

*New York v. FERC*, 535 U.S. 1 (2002) .................................. 10, 17-18, 21

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015).....................................10

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .............................17, 20

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ........................................10

*South Carolina Public Serving Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ...........................................................7, 11, 15

*U & I Sanitation v. City of Columbus*, 205 F.3d 1063 (8th Cir. 2000).............21, 22

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) ......................................19

*Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) .............................................16

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ........................................................20

*Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560
    (4th Cir. 2005).......................................................................................21

STATUTES

16 U.S.C. § 824(a) .............................................................................10, 13

16 U.S.C. § 824(b) .........................................................................................1

66 Pa. C.S. § 1102(a)(1) ..............................................................................7

ADMINISTRATIVE RULINGS

*In re Application of Transource Maryland LLC*, No. 9471, 2020 WL
    3977589 (Md. Pub. Serv. Comm'n June 30, 2020)..........................................13

OTHER AUTHORITIES

29 C.F.R. § 776.29(a)..................................................................................18

*Transmission Planning and Cost Allocation by Transmission Owning
and Operating Public Utilities*, Order No. 1000, 76 Fed. Reg. 49,842
    (Aug. 11, 2011) .......................................................................1, 10, 16

**INTRODUCTION**

Plaintiff Transource Pennsylvania, LLC ("Transource") challenges a decision of the Pennsylvania Public Utility Commission ("PAPUC") that directly conflicts with a federal-law determination that a new electric transmission line is needed for the efficient interstate flow of electricity.  The PAPUC, however, denied approval for the line by expressly rejecting this federal need determination—and it did so expressly to serve its parochial interest in preventing low-cost power from leaving Pennsylvania.  The Federal Power Act ("FPA") preempts the PAPUC's disregard of a federal need determination, and the dormant Commerce Clause prohibits the PAPUC's economic protectionism.

The FPA vests the Federal Energy Regulatory Commission ("FERC") with responsibility for regulating interstate electric transmission facilities.  16 U.S.C. § 824(b).  In turn, FERC authorized "regional transmission organizations" (or "RTOs") to operate the transmission system and plan new transmission projects needed to ensure reliability or to improve the grid's efficiency.  *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, FERC Order No. 1000, 76 Fed. Reg. 49,842, 49,845 (Aug. 11, 2011) ("Order No. 1000").

This case concerns a transmission project needed to improve the efficiency of the regional grid covering the region including Pennsylvania.  Because of a

bottleneck, electricity cannot move freely into Virginia, Maryland, and the District of Columbia. That results in inefficiently high prices in Virginia, Maryland, and the District, which must rely on more expensive power generated locally, and inefficiently low prices in Pennsylvania, where lower-cost power is trapped. To address this pricing distortion by enabling electricity to flow more freely, the RTO overseeing the regional transmission system—PJM Interconnection, L.L.C. ("PJM")—authorized Transource to build new lines across Pennsylvania and into Maryland. Applying federal tariff provisions, PJM determined that the project is needed and that its benefits significantly outweigh its costs.

Transource then applied to the PAPUC for permission to site and construct the line. The PAPUC, however, denied Transource permission. It did not base its decision on any siting or construction consideration. Rather, it disagreed with PJM's benefit-cost methodology, which PJM is *required* to follow under its FERC-approved tariff and operating agreement. According to the PAPUC, a benefit-cost analysis should treat as a "cost" the increased price some Pennsylvania customers will pay once electricity more easily flows to other states—even though the whole point of PJM's planning is to reduce the inefficient price disparity currently benefitting those customers. Applying its own conflicting methodology, the PAPUC determined—contrary to PJM—that the new lines were not needed.

This determination is unlawful for two reasons.  First, the FPA preempts it.  The Supremacy Clause does not permit the PAPUC to substitute its own "need" finding and methodology for a FERC-approved need finding and methodology.  Nor may the PAPUC exercise its authority to frustrate the regional transmission process FERC has created.  Whenever a new line is built and allows electricity to flow more freely, prices rise in some places as they fall in others.  States may not deny siting in order to preserve the very pricing disparity that the federal planning process seeks to mitigate.  Indeed, in prior comments to FERC supporting federal transmission planning, the PAPUC concisely explained why its current decision cannot stand: It told FERC that federal regional planning is necessary to avoid an "ineffective, inefficient and chaotic and balkanized process" and must "select[] th[e] combination of projects that best serves the region as a whole."  Pl.'s Statement of Undisputed Material Facts ("SMF") ¶¶ 5–6.  That statement was and is correct, and the PAPUC acted unlawfully by reversing course.

Second, under the dormant Commerce Clause, states cannot engage in economic protectionism by preventing the interstate flow of low-cost electricity.  Yet here, the PAPUC rejected Transource's project expressly to favor in-state customers by hoarding low-cost electricity at out-of-state customers' expense.  The Supreme Court has already invalidated a state law barring the export of cheap power to benefit in-state interests.  The result should be no different here.

Relief is urgently needed.  Achieving national energy goals will require new transmission facilities nationwide—to serve *national*, multi-state needs.  If states can veto new lines to retain parochial benefits, the Nation will never achieve those goals. All states, including Pennsylvania, will suffer.  The Court should prevent that unacceptable outcome by declaring the PAPUC's decision unlawful and requiring it to consider Transource's application in accordance with federal law.

## BACKGROUND

FERC has charged PJM with maintaining the interstate bulk transmission system and operating a regional energy market in a 13-state region including Pennsylvania.  SMF ¶¶ 1–3.[1]  FERC has mandated that PJM develop "regional transmission plans" to identify solutions for interstate transmission needs. *Id.* ¶¶ 11– 12.  PJM conducts an annual regional transmission planning process, as approved by FERC.  *Id.* ¶¶ 7–10, 13, 18–19.

One part of this process identifies "congestion"—*i.e.*, bottlenecked areas where electricity cannot flow freely because of insufficient transmission, resulting in inefficient transmission and disparities in wholesale prices—and assesses projects that mitigate it.  *Id.* ¶¶ 15–17, 30.  PJM measures projects' benefits to the region and weighs them against the projects' costs.  *Id.* ¶¶ 21–22.  PJM requires that the benefits exceed the costs by at least 1.25:1, in accordance with a FERC order.  *Id.* ¶¶ 20–21.

---

[1] The accompanying SMF details the undisputed facts supporting the Motion.

For the project type here, PJM's FERC-approved tariff and operating agreement prescribe precisely how to measure benefits: as the change in net payments by wholesale electricity customers whose energy prices would fall due to the project. *Id.* ¶¶ 24–25.  PJM's tariff also describes precisely how to measure cost: as the project's "revenue requirement," or what it needs for economic viability.  *Id.* ¶ 26.  Only customers who benefit from lower energy prices pay the project's costs. *Id.* ¶¶ 27–28.

Because the purpose of addressing congestion is to increase efficiency and reduce wholesale-power pricing disparities by allowing electricity to flow more freely, new transmission often results in higher prices in some areas—namely, where congestion is inefficiently trapping low-cost electricity.   With the bottleneck removed, electricity flows more freely away to areas where customers otherwise must rely on more expensive local power.  PJM and FERC, however, do not treat as a "cost" the increase in prices for customers who benefit from congestion-depressed prices, and for good reason: Those "benefits" reflect an inefficiency resulting from inadequate transmission, which regional planning attempts to resolve.  *Id.* ¶ 29.

Here, PJM has identified congestion on the AP South Reactive Interface and related constraints running through Pennsylvania, which prevents low-cost power from efficiently reaching parts of Virginia, Maryland, and the District of Columbia. *Id.* ¶¶ 31–34, 43.  Instead, it is "stuck" in parts of Pennsylvania.  *Id.* ¶¶ 33, 44.  The

costs are "ultimately born by residents, commercial businesses and industrial customers" south and east of the constraint—and from 2012 to 2016, the costs totaled $800 million. *Id.* ¶ 34 (Recommended Decision at 3).

Under its FERC-approved tariff, PJM solicited proposals to alleviate this congestion. *Id.* ¶¶ 17, 32. Transource Energy, Transource's parent, submitted "Project 9A," whose main component is the "IEC Project." The IEC Project would build two new transmission connections spanning the Pennsylvania-Maryland border. *Id.* ¶¶ 35–37. It would lower prices in Virginia, Maryland, the District of Columbia, and Western Pennsylvania, but would—by freeing electricity currently stuck behind a bottleneck—raise prices elsewhere in Pennsylvania. *Id.* ¶¶ 43–44.

PJM approved the IEC Project and concluded it would "alleviate AP-South congestion." *Id.* ¶ 39; *see id.* ¶¶ 38–42. It found the project was the most "efficient, cost-effective project to address" the problem. *Id.* ¶ 39. PJM calculated that the project promised regional benefits of up to $1.2 billion. *Id.* ¶ 41. The benefit-cost ratio has always exceeded the 1.25:1 benchmark. *Id.* ¶¶ 42, 47. In 2016, PJM and Transource Energy executed (and FERC approved) a Designated Entity Agreement ("DEA"), which made Transource Pennsylvania responsible for the project's Pennsylvania portion. *Id.* ¶¶ 45–46. PJM has studied the project annually to ensure it remains cost-justified. *Id.* ¶ 47.

Although the FPA vests authority over interstate transmission planning in FERC (and FERC-designated RTOs like PJM), states retain authority over siting and construction—meaning states decide where a project will go and how it will be built. *E.g.*, *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 62 (D.C. Cir. 2014) (per curiam). In Pennsylvania, the PAPUC oversees siting and construction. SMF ¶ 48. It also authorizes entities to act as Pennsylvania public utilities. 66 Pa. Cons. Stat. § 1102(a)(1). Transource thus applied for public-utility status and a certificate of public convenience. SMF ¶ 49. The PAPUC conferred public-utility status and provisionally granted that certificate. *Id.* ¶ 51. Transource also applied for siting permits for the two parts of the project in Pennsylvania, and, on receiving the provisional certificate, filed zoning petitions and eminent-domain applications. *Id.* ¶¶ 50, 52.

A PAPUC administrative law judge ("ALJ") recommended that Transource's application be denied because Transource had "failed to show need for the project within the meaning of [PAPUC] Regulations and the Pennsylvania Public Utility Code." *Id.* ¶ 53 (Order at 17–18). The ALJ acknowledged that PJM had determined the project was needed and cost-justified but concluded that PJM's determination did not bind the PAPUC. *Id.* ¶¶ 55–57. Purporting to apply Pennsylvania law, the ALJ determined that Transource had not shown "need" because the project would raise prices for Pennsylvania customers. *Id.* ¶¶ 58–59. Although the ALJ recognized

that "Pennsylvania has benefitted from its participation in PJM and through regional transmission planning," the ALJ concluded that "under these particular circumstances" the "project does not provide sufficient benefits to Pennsylvania or the PJM region as a whole." *Id.* ¶ 59 (Recommended Decision at 97).

Transource challenged this conclusion before the full PAPUC, which agreed that Transource had not shown "need." *Id.* ¶¶ 61–63, 73. Per the PAPUC, "need, established under the applicable federal standards imposed by FERC and implemented by PJM do[es] not necessarily satisfy the requirement for 'need'" under state law. *Id.* ¶ 67 (Order at 54); *see id.* ¶¶ 64–69. It acknowledged that "Project 9A would … alleviate the economic congestion on a regional level." *Id.* ¶ 71 (Order at 59). But it observed that the project "would result in higher rates in Pennsylvania." *Id.* And it emphasized that its "concern" was "[t]he potential negative and practical impact on the citizens and consumers of Pennsylvania." *Id.* The PAPUC therefore applied its own "Pennsylvania-also" benefit-cost calculation, different from PJM's, that included as a project cost the increased costs incurred by Pennsylvania customers who benefit from inefficient congestion. *Id.* The PAPUC thus found that Transource had not shown "need" and—based solely on that finding—denied Transource's application and rescinded its certificate of public convenience. *Id.* ¶¶ 70–72, 75–77. The decision took immediate effect. *Id.* ¶ 78.

Transsource has moved for expedited consideration of its claims for declaratory relief under Rule 57.[2]

## QUESTIONS INVOLVED

1. Whether PAPUC's decision is preempted?

2. Whether PAPUC's decision violates the Commerce Clause?

## ARGUMENT

### I.   The Federal Need Determination Preempts The PAPUC's Contrary Decision.

The PAPUC's order violates the Supremacy Clause.   As the PAPUC recognized, "need" has been "established under the applicable federal standards imposed by FERC and implemented by PJM."   SMF ¶ 67 (Order at 54).   The PAPUC, however, overrode that federal determination based on its own conflicting benefit-cost calculation, which does just what PJM and FERC have rejected: It treats the increased prices incurred by Pennsylvania customers currently benefiting from congestion as a "cost" weighing against the project, even though the project's entire point (as approved by PJM) is to eliminate that pricing disparity.

The Supremacy Clause preempts the PAPUC's conflicting choice.  "Federal law can preempt state law" through, *inter alia*, "conflict preemption."  *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010).  Conflict preemption exists (1) "[w]here

---

[2] Transsource has contemporaneously sought review of state-law issues in the Commonwealth Court.

state and federal law 'directly conflict,'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011), or (2) "where 'the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,"'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015).  A FERC-approved tariff has the force of federal law, *e.g.*, *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998), and has preemptive effect, *see Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003) ("[I]nterstate power rates filed with FERC … must be given binding effect by state utility commissions … as a matter of federal preemption.").

Here, the PAPUC's decision both directly conflicts with federal law and frustrates its objectives.  Having accepted the benefits of federal planning, and having encouraged its development, Pennsylvania cannot now disavow that federal process to gain a parochial advantage as to one transmission project.

## A.     The PAPUC's Decision Directly Conflicts With Federal Law.

Pursuant to federal law, FERC established a specific standard by which PJM must determine transmission need.  There is no dispute that FERC acted within its authority in doing so: FERC regulates "transmission of electric energy in interstate commerce," 16 U.S.C. § 824(a), and interstate transmission planning is "squarely within [FERC's] jurisdiction," Order No. 1000, 76 Fed. Reg. at 49,862; *see New York v. FERC*, 535 U.S. 1, 22 (2002) (FPA contains "'a clear and specific grant of jurisdiction' to FERC over interstate transmissions").  Thus, while states maintain

power over "siting and construction," FERC alone controls interstate "transmission planning." *S.C. Pub. Serv. Auth.*, 762 F.3d at 62, 64.

The PAPUC acknowledged FERC's authority over transmission planning. SMF ¶ 69 (Order at 56) (recognizing "the federal power pursuant to which PJM conducts its selection for regional transmission planning purposes"). It also acknowledged the factors that the FERC-approved benefit-cost standard considers—and in particular, that the standard excludes from consideration the higher prices paid by Pennsylvania residents who today benefit from congestion. *See id.* ¶ 25 (Recommended Decision at 20) (ALJ's acknowledgment, adopted by the PAPUC, that PJM's methodology "excludes the change in net load payments for transmission zones that would see an overall increase as a result of constructing the market efficiency project"). Finally, the PAPUC acknowledged that PJM applied its FERC-approved methodology to find that Transource's project is needed: PJM identified an interstate congestion problem, solicited plans, applied its FERC-approved benefit-cost methodology to Transource's proposal, found that the benefit-cost ratio exceeded 1.25:1, and approved the project based on that need determination. *Id.* ¶¶ 31–38, 42–46.

Despite acknowledging all of this, the PAPUC rejected PJM's conclusion. It did so because it rejected PJM's federally approved methodology for assessing need—resulting in a directly conflicting determination. *Id.* ¶ 69. PJM's FERC-

11

approved methodology regards the disparity in wholesale prices currently benefiting Pennsylvania as a signal of transmission congestion that the planning process should mitigate.  The PAPUC, however, regarded that same disparity in prices as a local advantage that justified rejecting new regional transmission lines.  It is hard to imagine a more blatant conflict with federal law.

The Supremacy Clause does not permit such a conflicting state decision. Repeatedly, courts have rejected states' attempts to disregard federal determinations in just the way the PAPUC has done.  *E.g.*, *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988) ("States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair."); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 969 (1986) ("for a state ratemaking agency to disregard a FERC-filed rate would clearly be inconsistent with the exclusive federal regulatory scheme").  State utility commission decisions are preempted when they undertake "identical, independent inquiries regarding [a project's] merits" but "from the perspective of different public interests" and thereby "reach conflicting conclusions.  *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 905 (4th Cir. 1987); *id.* (West Virginia lacked authority to review a FERC-approved transmission agreement based on

"local concerns" that "conflict[ed]" with FERC's "comprehensive public interest determination"). When such conflicts arise, the state law must give way.[3]

## B. The PAPUC's Decision Is An Obstacle To Federal Objectives.

The PAPUC's need determination also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Farina*, 625 F.3d at 122. "The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *Id.* at 123.

That is exactly the case here. The FPA requires FERC to determine when electric transmission is "necessary in the public interest," which requires balancing benefits and costs across the affected region. 16 U.S.C. § 824(a). The FPA thus authorized FERC (and FERC authorized PJM) "to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives." *Farina*, 625 F.3d at 123. PJM does so using a particular, FERC-approved method of weighing regional costs and benefits that considers regional and national need. "Allowing state law to impose a different standard permits a re-

_____

[3] Indeed, faced with similar arguments regarding the Maryland portion of the line, the Maryland Public Service Commission held that federal law must control. *See In re Application of Transource Maryland LLC*, No. 9471, 2020 WL 3977589, at *41 (¶ 142) (Md. Pub. Serv. Comm'n June 30, 2020). Its unpublished decision is appended to this brief.

13

balancing of those considerations"—and a "state-law standard that is more protective of one objective may result in a standard that is less protective of others." *Id.* The PAPUC's order here inflicts just that unacceptable result: The PAPUC's "Pennsylvania-also" standard, by granting greater solicitude to in-state residents, shortchanges the interests of the region at large.

Preemption "is apparent from the impermissible interference that enforcement of [PAPUC's] order would create with the scheme of federal regulation." *Nantahala*, 476 U.S. at 970. Eliminating transmission congestion will always result in higher prices for customers benefiting from the existing inefficiency. If that is a permissible basis for state commissions to deny siting approval for new lines, the disruption to FERC's regulatory scheme is plain: Transmission projects designed to enhance the efficiency of the inherently *interstate* transmission grid would become all but impossible. As the PAPUC itself has acknowledged, "States … carry[ing] out their individual State jurisdictional responsibilities … cannot interfere with the national goals of creating a strong and fair wholesale energy market." SMF ¶ 71 n.4. Here, however, the PAPUC's decision thwarts the regional planning process and frustrates its goals.

14

### C.     The PAPUC's Order Is Not A Valid Exercise Of Its Siting Authority.

In defending its disregard of PJM's federally approved method, the PAPUC relied on limiting language from the FPA and Order No. 1000.  That language, however, provides no genuine support to the PAPUC's decision.

First, the PAPUC noted that the FPA extends federal authority only to "matters which are not subject to regulation by the States."  Order at 57 (quoting 16 U.S.C. § 824(a)).  But regional transmission planning is within federal (not state) jurisdiction—which is why courts have upheld FERC's authority to regulate such planning.  *See S.C. Pub. Serv. Auth.*, 762 F.3d at 56–58.

Second, the PAPUC invoked statements in Order No. 1000 that FERC did not intend to exercise authority in state-jurisdictional areas, "such as matters relevant to siting, permitting, and construction."  Order at 57 (quoting Order No. 1000, 76 Fed. Reg. at 49,861); *see S.C. Pub. Serv. Auth.*, 762 F.3d at 57–58.  Those caveats, however, are irrelevant because the PAPUC did not make a genuine "siting" or "construction" decision; it made a *need* determination and explicitly refused to address genuine siting considerations.  SMF ¶ 63 (Order at 64–66).  As the PAPUC itself observed at the inception of RTOs, the FPA leaves to states only "specific siting, land use and condemnation issues"—but "where a transmission network spans several states," the "arbiter and policymaker with respect to long term planning, policy and resource allocation issues" is the "federal or regional entity"

15

(*i.e.*, PJM).  *Id.* ¶ 69 n.3.  "In a pre-emption case, … a proper analysis requires consideration of what the state law in fact does, not how" a regulator "might choose to describe it."  *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013).

Indeed, the PAPUC itself forthrightly acknowledged that it was making its own need determination in direct conflict with PJM's methodology.  *E.g.*, SMF ¶ 71 (Order at 59) (PAPUC considered "evidence on the issue of 'need'").  The PAPUC cannot point to its authority over "siting and construction" to justify overriding a federal need determination grounded in FERC's power over regional transmission planning.  *See* Order No. 1000, 76 Fed. Reg. at 49,861 (distinguishing state authority over "siting, permitting, and construction" from "transmission planning and cost allocation requirements … used to identify and evaluate transmission system needs and potential solutions to those needs").  To hold otherwise would invert the Supremacy Clause and render FERC hostage to conflicting state determinations.

Invalidating the PAPUC's actions here will leave Pennsylvania with many ways to protect residents' legitimate interests.  If Pennsylvania wishes to avoid price increases for Pennsylvania customers, it can exercise its jurisdiction over retail rates. It can also encourage the study of transmission projects that help Pennsylvania access lower-cost power or support energy-efficiency programs that reduce demand. It can advocate before FERC for changes to PJM's methodology for evaluating need. It can even encourage Pennsylvania's utilities to leave PJM and withdraw the state

from the regional planning process.  What Pennsylvania cannot do, under the Supremacy Clause, is to disregard PJM's FERC-approved determination of need based on a conflicting benefit-cost analysis, by counting costs that PJM's FERC-approved tariff specifically instructs should *not* be counted.

## II.    The PAPUC's Decision Violates The Dormant Commerce Clause.

Independently, the PAPUC's decision violates the dormant Commerce Clause because it restricts the flow of low-cost power out of Pennsylvania expressly to maintain in-state customers' economic advantage.

The dormant Commerce Clause "prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-state interests' expense." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002).  First, if a state regulation "discriminates against interstate commerce 'either on its face or in practical effect,'" it "is *per se* invalid" unless the state has no other means of advancing a legitimate local interest.  *Id.* at 210–11. Second, under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), even "even-handed[]" regulation that merely "incidentally" burdens interstate commerce is invalid if the burdens are "'clearly excessive in relation to the putative local benefits,'" *Cloverland-Green*, 298 F.3d at 211.  Because "transmissions on the interconnected national grids constitute transmissions in interstate commerce," *New*

*York*, 535 U.S. at 16; *see* 29 C.F.R. § 776.29(a), the dormant Commerce Clause's principles apply to state transmission decisions.

Here, the PAPUC's need determination is both *per se* invalid and flunks *Pike*.

**A.     The PAPUC's Decision Is Discriminatory And Thus *Per Se* Invalid.**

The PAPUC's decision discriminates on its face against interstate commerce. PJM approved the project because it would benefit customers by eliminating congestion that leaves prices artificially high in some places and keeps them artificially low in others.  But the PAPUC perceived that those who would benefit from the increased efficiency resided in Maryland, Virginia, and the District of Columbia.  *E.g.*, SMF ¶ 43 (Recommended Decision at 38).  It thus denied Transource's applications specifically to hoard low-cost electricity for its residents and to avoid a "negative impact [on] the citizens and consumers of the Commonwealth" from the projects' pro-efficiency elimination of congestion.  *Id.* ¶ 71 (Order at 59).

At every turn, economic protectionism suffused the PAPUC's decision.  To justify applying heightened scrutiny to PJM's decision and data, it relied on a predicted "substantial increase in utility rates within the Commonwealth."  *See id.* ¶ 72 (Order at 60).  Then, the PAPUC blessed the ALJ's reweighing of PJM's analysis, *id.* ¶¶ 71, 73, based on the ALJ's view that "PJM's failure to consider increased wholesale power prices in Pennsylvania when calculating the benefit-cost

ratio … cast doubt on the benefits, if any to Pennsylvania," *id.* ¶ 59 (Recommended Decision at 98).  The PAPUC thus sought to do exactly what the dormant Commerce Clause forbids: benefit in-state customers at "out-of-state interests' expense." *Cloverland-Green*, 298 F.3d at 210.  Allowing such an order to stand "would make a virtue of the vice that the rule against discrimination condemns."  *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994).

It would also contravene on-point Supreme Court precedent.  In *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339, 344 (1982), the Supreme Court invalidated a New Hampshire Public Utilities Commission order prohibiting a utility from selling hydroelectric power outside the state.  The New Hampshire Commission, like the PAPUC, "made clear that its order is designed to gain an economic advantage for New Hampshire citizens at the expense of New England Power's customers in neighboring states."  *Id.* at 339.  And like the PAPUC's decision, the order placed "direct and substantial burdens" on interstate commerce. *Id.*  The Supreme Court thus held that the order was "precisely the sort of protectionist regulation that the Commerce Clause declares off-limits."  *Id.*

*New England Power* resolves this case.  The fact that New Hampshire banned *all* exports of hydroelectricity by statute, while the PAPUC has sought to prevent *some* additional electricity exports, is irrelevant. The "volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the

19

determination whether a State has discriminated against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992).  Regardless of how imposed or their degree, "state-imposed burdens cannot be squared with the Commerce Clause when they serve only to advance 'simple economic protectionism.'"  *New England Power*, 455 U.S. at 339.   The PAPUC's decision is thus "*per se* invalid." *Cloverland-Green*, 298 F.3d at 211.

True, even a facially discriminatory state law may be lawful if it survives "rigorous scrutiny" as the only means by which the state can achieve a legitimate local interest.  *Id.*  Here, however, the PAPUC relied purely on protectionism.  *See* SMF ¶ 71 (Order at 59) ("The potential negative and practical impact on the citizens and consumers of Pennsylvania is our concern …").   And "simple economic protectionism" is not a legitimate state interest.  *New England Power*, 455 U.S. at 339; *cf. supra* at 16–17 (explaining that Pennsylvania has other options for reducing prices for in-state customers, including via retail-rate regulation).

## B.    The PAPUC Burdens Commerce In A Manner Disproportionate To Any Legitimate Local Benefits.

The PAPUC's decision also flunks *Pike*'s balancing test.  *Pike* invalidated a facially neutral state law because its "burdens" on interstate commerce were "clearly excessive in relation to the putative local benefits."  397 U.S. at 142.  Routinely,

courts have applied *Pike* to invalidate state actions that unduly burden interstate commerce.[4]

Here, the PAPUC's order burdens interstate commerce by privileging in-state customers and preventing the alleviation of congestion across state lines.  And these burdens are clearly excessive in comparison with the supposed "local benefits" of lower prices resulting from transmission congestion.  Pennsylvania residents have no legitimate claim to retain the incidental benefits of inefficient congestion.

Nor does this case involve an area where "the propriety of local regulation has long been recognized." *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, 538 F.3d 241, 250 (3d Cir. 2008).  Interstate transmission has long been regarded as an exclusively *federal* realm.  *New York*, 535 U.S. at 6–7.  Indeed, any state interest is even weaker here because Pennsylvania allowed its utilities to join PJM, supported regional transmission planning, and long reaped the benefits in the form of improved reliability and efficiency.  Having collected the benefits of regional planning, the PAPUC cannot claim any legitimate interest in avoiding the burdens—and, in so doing, harming its neighbors to preserve an unearned advantage.

---

[4] *See, e.g.*, *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1261–62 (11th Cir. 2012); *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 573–74 (4th Cir. 2005); *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 912 (7th Cir. 2003); *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1069–72 (8th Cir. 2000).

Meanwhile, the burdens on interstate commerce are severe.  The congestion PJM seeks to alleviate through the IEC Projects "cause[s] load-serving entities in Virginia, Maryland, and Washington D.C. to rely on higher-cost generation."  SMF ¶ 33 (Recommended Decision at 51).  Out-of-state customers paid $800 million more from 2012–2016 because congestion prevented them from accessing lower-cost power.  *Id.* ¶ 34 (Recommended Decision at 3).  The PAPUC's decision here ensures that those burdens will continue—by preserving the bottleneck that prevents low-cost electricity from leaving the state and thwarting PJM's attempt to achieve the efficiency that come from the free flow of electricity.

In assessing these burdens, moreover, the Court must consider the implications if other states adopt the PAPUC's approach.  *See U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1071 (8th Cir. 2000) (courts "must ascertain 'what effect would arise if not one, but many or every, jurisdiction adopted similar [regimes].'" (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 337 (1989)).  The PAPUC's decision invites state regulators to veto federal interstate transmission planning decisions—no matter how great the regional and national benefits—whenever a particular project does not bring local benefits they deem sufficient.  Allowing the PAPUC's decision to stand will empower the states to pursue the very Balkanization that the dormant Commerce Clause seeks to prevent.

Under both the *per se* rule and the *Pike* balancing test, the PAPUC's order violates the dormant Commerce Clause and must be set aside.

## CONCLUSION

The Court should grant Transource's motion for summary judgment.

July 2, 2021                                    Respectfully submitted,

/s/ Matthew E. Price
Matthew E. Price (DC ID # 996158)          James J. Kutz (PA ID #21589)
(*Pro Hac Vice*)                                 Anthony D. Kanagy (PA ID # 85522)
Zachary C. Schauf (DC ID # 1021638)        (*Pro Hac Vice*)
(*Pro Hac Vice* filed)                          Erin R. Kawa (PA ID # 308302)
JENNER & BLOCK LLP                        Lindsay A. Berkstresser (PA ID #
1099 New York Ave. NW                      318370)
Suite 900                                   Post & Schell, P.C.
Washington, DC  20001-4412                  17 North Second Street
(202) 639-6873                              12th Floor
mprice@jenner.com                           Harrisburg, PA 17101-1601
zschauf@jenner.com                          Phone: (717) 731-1970
                                            jkutz@postschell.com
E. Glenn Rippie (IL ID # 6190725)          akanagy@postschell.com
(*Pro Hac Vice*)                                 ekawa@postschell.com
JENNER & BLOCK LLP                        lberkstresser@postschell.com
353 North Clark Street
Chicago, Illinois  60654                    Hector Garcia-Santana (VA ID #
(312) 222-9350                              48304)
grippie@jenner.com                          (*Pro Hac Vice* to be filed)
                                            AMERICAN ELECTRIC POWER
                                            SERVICE CORPORATION
                                            1 Riverside Plaza, 29th Floor
                                            Columbus, OH  43215
                                             (614) 716-3410
                                            hgarcia1@aep.com

*Counsel for Plaintiff Transource Pennsylvania, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 7.8(b)(2) because it contains 4,954 words, as measured by the word-count feature of Microsoft Word 2016.

/s/  Matthew E. Price

Matthew E. Price