## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRANSOURCE PENNSYLVANIA, LLC, | : : : | Civil No. 1:21-CV-01101 |
| Plaintiff, | : : | |
| v. | : : | |
| STEVEN M. DEFRANK, *et al.*, | : : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This is a declaratory judgment action filed by Plaintiff Transource Pennsylvania, LLC ("Transource") against the Pennsylvania Public Utility Commission ("PUC") and its Commissioners (collectively, "Defendants").

This case concerns federalism and the allocation of powers between federal and state entities. The federal government has reserved for itself the power to regulate the transmission of electric energy in interstate commerce, including in wholesale ratemaking and interstate and regional planning. The federal government exercises these powers through the Federal Energy Regulatory Commission ("FERC"). FERC has, in turn, delegated some of these powers to Regional Transmission Organizations ("RTOs"). The RTOs assess regional needs by methods approved by FERC, which include economic analyses. By contrast, the states retain the powers of siting, construction, and permitting for regional energy infrastructure.

1

In this case, the RTO at issue determined a need for regional transmission lines.  But, when Transource, the entity with which the RTO was collaborating, submitted its application to the PUC, the application was denied.  Specifically, the PUC made a determination that the project was not needed.  In substance, the PUC did not base its determination on considerations of siting or construction, but instead on whether it was worthwhile to ensure that consumers across a region or across state lines have similar access to low-priced electricity.

The court must decide whether the PUC has violated the Constitution in making this determination.  Specifically, the court must determine whether the PUC violated the Supremacy Clause, by issuing a decision directly conflicting with federal law or serving as an obstacle to federal objectives.  The court must likewise determine whether the PUC's decision violated the dormant Commerce Clause either by denying the application out of economic protectionism or burdening interstate commerce.  To some extent, these issues overlap, though the court will address them individually below.  For the reasons explained in the following sections, the court finds that the PUC's decision violated the Supremacy Clause and the dormant Commerce Clause.  Based on these findings, the court will deny Defendants' motion for summary judgment and grant Transource's motion for summary judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

## A. Federal and state regulatory regimes

In the Federal Power Act ("FPA"), Congress provided FERC with broad powers. 16 U.S.C. § 791a, *et seq.* Included among these powers are the authority to regulate wholesale sales of electricity and transmission of electric energy in interstate commerce. *Id.* at § 824. It also provided FERC with authority to regulate practices that affect the rates for these activities. *See id.* at §§ 824b, 824d, 824e. FERC must ensure the rates and practices which affect transmission of electricity are "just and reasonable." *Id.* at §§ 824d(a), 824e(a).

The FPA empowers FERC with the ability to regulate "the transmission of electric energy in interstate commerce," but with the caveat that "such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." *Id.* at § 824(a). Despite this language, the Supreme Court has observed that the FPA expanded federal powers into areas historically regulated by states. The Court noted that the FPA did "a good deal more" than augment FERC's powers to include areas hitherto exercised neither by federal nor

---

[1] This section of this memorandum includes only the background relevant to the resolution of the motions for summary judgment. Any additional factual recitation that is necessary for the discussion of each specific issue is included in the Discussion section of this memorandum. In considering the instant motion for summary judgment, the court relied on the uncontested facts. Where facts were disputed, the court viewed the facts in the light most favorable to the nonmoving party and has drawn all inferences in favor of the nonmovant, pursuant to the relevant standard for deciding a motion for summary judgment. *See Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

state regulators. *New York v. FERC*, 535 U.S. 1, 21 (2002). Instead, the FPA "authorized federal regulation not only of wholesale sales that had been beyond the reach of state power, but also the regulation of wholesale sales that had been *previously subject* to state regulation." *Id.* Two powers which the FPA reserved for the federal government were regulating interstate transmissions as well as interstate wholesale sales. *Id.*

In addition, the Supreme Court described the limiting language of federal powers in § 824(a) as "a mere policy declaration." *Id.* at 22. The Court further noted that such a policy declaration "cannot nullify a clear and specific grant of jurisdiction [to FERC], even if the particular grant seems inconsistent with the broadly expressed purpose." *Id.* (internal quotation marks omitted).

Under the FPA, FERC delegates some of its powers and responsibilities to RTOs. (Doc. 164, ¶ 1.) One such RTO is PJM Interconnection, L.L.C. ("PJM"). (Doc. 164, ¶ 1.) FERC charged PJM with maintaining the bulk electric transmission system of a 13-state region, which includes most of Pennsylvania. (*Id.*)

In 2011, FERC issued Order No. 1000, which had two primary objectives:

(1) Ensure that transmission planning processes at the regional level consider and evaluate, on a non-discriminatory basis, possible transmission alternatives and produce a transmission plan that can meet transmission needs more efficiently and cost-effectively; and (2) ensure that the costs of transmission solutions chosen to meet regional

4

transmission needs are allocated fairly to those who receive benefits from them.

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, FERC Order No. 1000, 76 Fed. Reg. 49,842, 49,845 (2011) ("Order 1000").  Order 1000 made clear that the federal determination of regional transmission planning and cost allocation includes "the processes used to identify and evaluate transmission system needs and potential solutions to those needs." *Id.* at 49,861.  But it does not include state matters, such as "siting, permitting, and construction."  *Id.*  As a result, even where regional planning identifies and selects a regional transmission plan or project, "such solutions may not ultimately be constructed should the developer not secure the necessary approvals from the relevant state regulators."  *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, FERC Order No. 1000-A, 77 Fed. Reg. 32,184, 32,215 (2012) ("Order 1000-A").

Under the federal regime, the responsibilities of RTOs include "planning, and [] directing or arranging, necessary transmission expansions, additions, and upgrades that will enable it to provide efficient, reliable and non-discriminatory transmission service and coordinate such efforts with the appropriate state authorities."  18 C.F.R. § 35.34(k)(7).  As part of their planning process, an RTO "must encourage market-driven operating and investment actions for preventing and relieving congestion."  *Id.* at § 35.34(k)(7)(i).

While the federal government and RTOs are responsible for planning and directing non-discriminatory transmission, the state has a separate purview. The states' authority encompasses issues of siting, permitting, and construction for regional transmission projects. As applicable in this case, Pennsylvania law provides that before constructing an electric transmission line, public utilities like Transource must submit a siting application to the PUC. (Doc. 148, p. 20.)[2]  The PUC is the Pennsylvania agency responsible for "oversight of the siting and construction of electric transmission lines." (Doc. 164, ¶ 83.)

To obtain approval for their application, public utilities must satisfy the following requirements by a preponderance of the evidence:

1) That there is a need for it.

2) That it will not create an unreasonable risk of danger to the health and safety of the public.

3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.

4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

52 Pa. Code § 57.76(a).

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

There is no dispute as to the existence or characterization of the federal and state regulatory regimes that apply to the Project. Therefore, some references for this subsection are drawn from the parties' briefing.

### B.   PJM's regional assessment

In addressing congestion, FERC directed PJM in June 2007 to "file a formulaic approach to choose economic projects proposed to reduce congestion that describes exactly how any metrics will be calculated, weighed, considered, and combined." *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,265, 62,492–62,493 (2007); *see also* Doc. 164, ¶ 16.  In October 2007, PJM proposed such a formulaic approach to FERC.  (Doc. 164, ¶ 17.)

In the context of an electricity transmission grid, "[c]ongestion occurs when the least costly resources that are available to serve load in a given region cannot be dispatched because transmission facility limits constrain power flow on the system."  (Doc. 157, ¶ 10; Doc. 164, ¶ 10; Doc. 157-1, p. 18.)  According to a 2008 FERC order, "without a process for identifying economic transmission, PJM's customers located in load pockets and separated from the rest of the system by congested transmission bottlenecks, will have few opportunities to access alternative resources that have lower prices for electricity."  *PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,051, 61,411–61,412 (2008) ("2008 FERC Order").

In partial fulfillment of its RTO responsibilities, PJM creates an annual Regional Transmission Expansion Plan ("RTEP").  (Doc. 159, ¶ 7.)  A component of the RTEP is a market efficiency analysis, in which PJM identifies areas where

congestion exists and identifies solutions to reduce the identified congestion.  (*Id.* ¶ 8.)

Under the approach that PJM proposed to FERC in October 2007, it would conduct market efficiency analysis for proposed projects.  (Doc. 164, ¶ 17.)  This analysis would provide a benefit-cost ratio for a given project over a 15-year span.  (*Id.* ¶¶ 17–18.)  For PJM to include a given project in its RTEP, the benefit-cost ratio must be at least 1.25 to 1.0.  (*Id.* ¶ 18.)  On April 17, 2008, FERC approved PJM's proposed approach.  (Doc. 164, ¶ 21; Doc. 157-8; *see also* 2008 FERC Order, 123 FERC at 61,416.)

FERC acknowledged objections to PJM's proposed method but explained that PJM's approach was reasonable.  (Doc. 164, ¶ 22.)  In PJM's approach, benefit and cost of a project would be analyzed by "summing the energy benefit . . . for only those zones that experience reduced energy payments – which are the zones that would be assigned the costs of these facilities."  (*Id.*)  The calculation would not include "the expected energy payment increases, if any, in other zones."  (*Id.*)  FERC found "this approach reasonable because it would match the project selection process to the existing cost allocation method.  That is, it would evaluate the load payment benefits of those loads that will be assigned the costs of the new facilities."  (*Id.*)

## C. The Project

Before soliciting projects for PJM's 2014/2015 window, PJM identified congestion within its region, and specifically "on the AP South Reactive Interface" subregion ("APSRI"). (Doc. 164, ¶¶ 61–62.)[3] PJM found that congestion across the APSRI along the Pennsylvania-Maryland border had imposed "economic transmission constraint costs totaling approximately $800 million from 2012 through 2016." (*Id.* ¶ 62.)[4]

In October of 2014, PJM opened a "long-term RTEP proposal window . . . to solicit market efficiency proposals in order to alleviate congestion" in the APSRI. (Doc. 159, ¶ 21.) In response to PJM's solicitation, the parent company of Transource proposed a project ("Project").[5] (*Id.* ¶ 22.) The Project is a set of proposed transmission lines beginning in West Virginia and ending in Maryland. (*Id.* ¶ 23.) The portion of the Project at issue in this action would place high voltage transmission lines in Pennsylvania's Franklin and York Counties, where

---

[3] Defendants state that they dispute this fact, but fail to cite to any evidence that negates the existence of congestion. Instead, they assert that the amount of congestion dropped precipitously beginning in 2015. (Doc. 164, ¶ 62.) But this does not negate Transource's assertion that PJM found congestion on the AP South Reactive Interface from 2012 to 2016. (*Id.*)

[4] Defendants again state that they dispute this fact, but fail to cite to any evidence that negates the existence of congestion. Instead, they assert that the amount of congestion dropped precipitously beginning in 2015. (Doc. 164, ¶ 62.)

[5] The Project is alternatively referred to as Project 9A or the Independence Energy Connection Project ("IEC Project"). (Doc. 159, ¶ 22.) But the IEC Project is also referred to as a subset of Project 9A. (*Id.* ¶ 24; Doc. 164, ¶¶ 64–66.) For ease of use and clarity, this memorandum uses the term "Project."

they would run from new substations to the Pennsylvania/Maryland border.  (*Id.* ¶ 24.)

The PJM Board approved the Project in 2016, determining that it was "the more efficient, cost-effective project" to address the congestion in the APSRI. (Doc. 164, ¶ 68.)[6]  The Project, if built, would benefit parts of Virginia, Maryland, Washington, D.C., and Western Pennsylvania.  (*Id.* ¶ 71.)  Meanwhile, other regions which benefit from the current congestion would "no longer have the benefit of [the] lower-cost power."  (*Id.* ¶¶ 71–72.)

As of March 2020, PJM projected that the Project would lead to lower costs in benefited areas by $844,806,909.44.  (*Id.* ¶¶ 73, 77.)  At the time, the Project's construction cost, which would be paid by the customers of benefiting areas, was estimated to be between $509 million and $528 million.  (*Id.* ¶ 78.)  The Project thus "exceeded the 1.25:1 benefit-cost threshold required under PJM's Operating Agreement for market efficiency projects."  (Doc. 157-7, p. 57.)[7]

---

[6] Although Defendants dispute this fact, their citation to the record does not actually contradict this fact.  (Doc. 164, ¶¶ 68, 137.)

[7] Although Defendants dispute this fact, their citation to the record does not contradict this fact. Transource relies on a 2020 ALJ recommendation which, in turn, states that "PJM's basis for selecting the IEC Project is that it exceeded the 1.25:1 benefit-cost threshold required under PJM's Operating Agreement for market efficiency project."  (Doc. 164, ¶ 79; Doc. 157-7, p. 57.) Defendants seek to contradict this assertion by relying on a 2022 PJM document which provides a "2021 Re-Evaluation of Project 9A," including various benefit-to-cost ratios and one of 1.00. (Doc. 164, ¶ 79; Doc. 164-2, p. 95.)  But Defendants' citation, showing a later and different ratio, does not refute the accuracy of the earlier figure.

In November 2016, PJM and Transource's parent company executed a Designated Entity Agreement ("DEA"), which allocated responsibilities between PJM and Transource for the Project.  (Doc. 164, ¶ 80.)  In January 2017, FERC approved the DEA.  (*Id.* ¶ 81.)  In the same order, FERC determined that the Project would "reduce the cost of delivered power by reducing transmission congestion."  (*Id.* ¶ 82.)

On February 8, 2017, Transource filed an application for the Project to the PUC.  (Doc. 164, ¶ 84.)  Throughout 2017 and 2018, the PUC granted various approvals to Transource applications, none of which are relevant to the analysis in this memorandum.  (*Id.* ¶¶ 84–88.)

On December 22, 2020, the PUC Administrative Law Judge ("ALJ") issued a Recommended Decision, which recommended that the PUC deny Transource's siting applications because Transource had failed to show a need for the project.  (*Id.* ¶ 89.)  The ALJ stated that, in determining a need under Pennsylvania law, the PUC may consider economic and environmental impacts.  (*Id.* ¶ 91.)

The ALJ determined that the benefit-cost methodology, approved by FERC and used by PJM to assess whether the Project was worthwhile, was "deficient when measured against the constitutional, statutory, and regulatory standards of Pennsylvania law."  (Doc. 157-7, p. 104.)  The ALJ considered Transource's argument that "congestion represents a form of rate discrimination."  (*Id.* at 105.)

The ALJ disagreed and concluded that "[e]conomic congestion is not a form of rate discrimination, rather, it is a market-based response to a variety of factors." (*Id.* at 106.)

The ALJ concluded that "Pennsylvania has benefitted from its participation in PJM and through regional transmission planning; however, under these particular circumstances, the IEC Project as a market efficiency project does not provide sufficient benefits to Pennsylvania or the PJM region as a whole." (Doc. 164, ¶ 94.)  The ALJ was persuaded by witness testimony that, if the Project were built, it could save "utilities in Maryland, Virginia, and the District of Columbia almost a billion dollars over 15 years," but if the Project were not built, the same power would be used "in Pennsylvania, Ohio, Illinois, and New Jersey at a cost of about $970 million." (*Id.*)  The ALJ concluded the following:

> PJM's failure to consider increased wholesale power prices in Pennsylvania when calculating the benefit-cost ratio, frequent changes to how the benefit-cost ratio is calculated even during this proceeding, changes to how the benefits are simulated, and the uncertain nature and extent to which transmission zones benefit all cast doubt on the benefits, if any to Pennsylvania.

(*Id.*)  The ALJ concluded that "[i]ncreased wholesale power prices are real costs to customers that show there is no need for the project." (*Id.*)  For that reason, the ALJ recommended that the siting applications and eminent domain applications be denied because "no need ha[d] been proven." (*Id.* ¶ 95.)

Transource appealed the ALJ's Recommended Decision to the PUC.  (Doc. 159, ¶ 39; Doc. 164, ¶ 96.)  On May 24, 2021, the PUC issued its order, which forms the basis of this litigation.  (Doc. 159, ¶ 40; Doc. 164, ¶ 97; *see* Doc. 157-1.) The order denied Transource's siting applications and "adopted and incorporated" the ALJ's findings.  (Doc. 159, ¶ 40; Doc. 164. ¶ 98.)

In considering Transource's application, the PUC agreed with the ALJ that it was free to set aside PJM's economic analysis in determining the need or benefit-cost ratio of the Project.  (*See* Doc. 164, ¶ 106.)  It stated that "[t]he potential negative and practical impact on the citizens and consumers of Pennsylvania is our concern, and it is properly within the scope of our consideration of the weight of all the evidence on the issue of 'need.'"  (*Id.*)

The PUC concluded that "the federal authority under which PJM operates does not extend beyond PJM's approval process, where approval is sought from a state commission."  (*Id.* ¶ 104.)  Instead, agreeing with and quoting the ALJ, the PUC found that "while the Federal Power Act (FPA) does grant FERC exclusive jurisdiction over the interstate transmission of electric energy and electric wholesale rates, the FPA limits FERC authority, including its designee, PJM, to 'those matters which are not subject to regulation by the States.'"  (Doc. 157-1, p. 61.)

In assessing whether a "need" existed for the Project under Pennsylvania law, the PUC rejected the PJM-approved criteria and methodology.  (*See* Doc. 164, ¶ 106.)  The PUC stated that "[t]he potential negative and practical impact on the citizens and consumers of Pennsylvania is our concern, and it is properly within the scope of our consideration of the weight of all the evidence on the issue of 'need.'"  (*Id.*)

On that basis, the PUC noted that relief of economic congestion on a regional level would result in higher utility rates in Pennsylvania.  (*Id.*)  The PUC concluded that "the ALJ properly considered the negative impacts to Pennsylvania in evaluating the 'need'" under state law.  (*Id.*)  The PUC also questioned the data upon which PJM's analysis rested, finding that it needed to better reflect "current and existing priority needs on the regional level" to have greater persuasive impact. (*Id.* ¶ 107.)

Because the PUC concluded that there was insufficient evidence to establish "need" under Pennsylvania law for the Project, it rescinded Transource's provisional certificate of public convenience.  (*Id.* ¶¶ 109–11.)

Once a market efficiency project, like the Project, is selected, PJM conducts annual re-evaluations to ensure said project still meets the required 1.25:1 benefit-cost ratio.  (*Id.* ¶ 113.)  In a 2018 PJM white paper, PJM stated that, since 2016, it had evaluated the Project four times.  (*Id.*  ¶ 114.)  PJM asserted that, in all four

evaluations, including the most recent in September 2018, the Project had passed the required 1.25:1 ratio.  (*Id.*)  Further, in the most recent re-evaluation, in 2022, the Project had a ratio of 2.48, which included "sunk costs."  (*Id.* ¶ 115.)[8]  In re-assessing the Project's benefits to consumers, PJM's analyses account "for all of the underlying system fundamentals" that drive changes in congestion, including modeling parameters, new generation, and new load forecasts.  (*Id.* ¶ 116.)

### D. The present action

Transource filed its complaint in this action on June 22, 2021, seeking declaratory and injunctive relief.  (Doc. 1.)  Transource sought declaratory relief on the grounds that the PUC's decision is preempted under federal law and violates the dormant Commerce Clause.  (*Id.* at 40.)  It also sought injunctive relief preventing enforcement of the PUC's decision, including its revocation of Transource's Certificate of Public Convenience.  (*Id.* at 41.)

On June 23, 2021, Transource filed a direct appeal of the PUC's decision revoking its provisional certificate to the Pennsylvania Commonwealth Court.  (Pa. Commw. Ct. Docket No. 689 CD 2021.)  In the appeal, Transource argued that the PUC "erred in rejecting PJM's determination of the need for the [] Project, which was presented as evidence to establish need under" Pennsylvania law.  (Doc. 148,

---

[8] Although Defendants dispute this fact, their citation to the record does not contradict this fact.

p. 21.)  It also argued that the PUC's "finding that the [] Project is not necessary to resolve congestion . . . is not supported by substantial evidence."  (*Id.* at 21–22.)

In the instant action, Transource filed a motion for summary judgment and a motion to expedite summary judgment on July 2, 2021.  (Docs. 20, 21.)  The parties submitted briefs on the motions.  (Docs. 23, 24, 61, 70, 74.)  Subsequently, on July 23, 2021, Defendants filed a motion to dismiss the action for lack of jurisdiction and failure to state a claim.  (Doc. 57.)  On August 17, 2021, the court held oral argument on the motions for summary judgment, to expedite, and to dismiss.  (Doc. 74.)

On August 26, 2021, the court issued an opinion and order denying the motion to dismiss in part, deferring ruling on the remainder of the motion, and staying the case, on abstention grounds, pending the outcome of the parallel case pending before the Pennsylvania Commonwealth Court.  (Docs. 82, 83.)  On May 17, 2022, Transource notified the court that the case pending before the Pennsylvania Commonwealth Court had resolved and that the parties wished to proceed with the litigation in this court.  (Doc. 90.)  The court lifted the stay on the same date.  (Doc. 91.)  Thereafter, the court set a schedule for supplemental briefing on the pending motions and allowed limited fact discovery in connection with the motion to expedite.  (Doc. 96.)

On August 5, 2022, the court denied Transource's motion to expedite.  (Doc. 116.)  On August 8, 2022, the court found the motion for summary judgment was prematurely filed and denied it without prejudice to refiling by the appropriate deadline set by the court.  (Doc. 119.)  Also on August 8, 2022, the court denied without prejudice Defendants' motion to dismiss.  (Doc. 118.)  In so doing, the court addressed claim and issue preclusion arguments which Defendants had raised.  The court concluded that, under Third Circuit precedent, claim preclusion should be analyzed under Pennsylvania law, "regardless of whether the plaintiff has classified its reservation as an *England*[9] reservation."  (*Id.* at 10.) The court concluded the following:

> [W]hile the PUC's decision could be entitled to preclusive effect under Pennsylvania law if Transource should have raised its federal claims before the Commonwealth Court, but chose not to, the court cannot answer this question without impermissibly making a fact determination: whether Defendants objected to Transource's notice of its intent to split its claims.

(*Id.* at 10–11.)  The court further concluded that "[i]f Defendants did not object to Transource's announced intention to split its claims, '[t]hey cannot now benefit from their silence.'"  (*Id.* at 11 (quoting *R & J Holding Co. v. Redevelopment Auth.*, 670 F.3d 420, 428 (3d Cir. 2011)).)

---

[9] *England v. La. St. Bd. of Med. Exam'rs*, 375 U.S. 411 (1964).

On August 11, 2022, the court held an on-the-record conference call. (Doc. 122.) During that call, in response to Plaintiff's counsel, the court stated the following: "[I]n light of the rulings I've made over the past week, what I'm clearly trying to convey to you, and now I will say expressly, is that I would like all of the issues in this case addressed in the summary judgment motions." (Doc. 168-1, pp. 13–14.)

In accordance with the on-the-record call, the court issued a case management order on August 12, 2022. (Doc. 123.) The final deadline that the order provided was for dispositive motions and supporting briefs to be submitted by February 15, 2023. (*Id.*) On February 1, 2023, the court granted a jointly proposed order to modify the briefing schedule provided in its case management order. (Doc. 145.) The court-approved order provided in part that Defendants should file their motion on or before March 8, 2023, and Transource should file its motion on or before March 29, 2023. (*Id.*) The parties filed their motions and supporting briefs in accordance with the court's order. (Docs. 146–48, 156–59, 164–65, 168–69.) Franklin County, Pennsylvania and PJM filed *amici curiae* briefs. (Docs. 155, 172.)[10] The court has reviewed the filings and the motions for summary judgment are ripe for disposition.

_____

[10] The court has reviewed these briefs, along with those of the parties, and thanks Franklin County and PJM for their helpful contributions. Although the court found the *amici* briefs helpful, this memorandum cites to the filings submitted by the parties.

On August 28, 2023, without moving to amend this court's established deadlines, Defendants filed a motion for judgment on the pleadings.  (Doc. 173.) After the issue was briefed, Transource filed a motion, which the court granted, for leave to docket a sur reply because Defendants' reply brief expounded on legal arguments which their initial brief merely mentioned.  (Docs. 181, 183.)  The court addresses the motion for judgment on the pleadings in a separate memorandum and order.

### STANDARDS OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case."  *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### A. Arguments About Preclusion

#### 1. Transource's claims are not barred by claim preclusion.

Defendants argue that Transource's claims are barred by claim preclusion. They point out that in this court's prior order, Doc. 118, it held that "the PUC proceeding was quasi-judicial in nature, and that the Full Faith and Credit Statute is applicable to this case." (Doc. 148, p. 45.)  They also assert that, in the same order, this court held that "the PUC's decision could be entitled to preclusive effect under Pennsylvania law if . . . Defendants objected to Transource's notice of its intent to split its claims." (*Id.*)

In making this argument, Defendants alter the quotation in a way that fundamentally changes the meaning of this court's finding.  The court explained as follows in the prior order:

> [W]hile the PUC's decision could be entitled to preclusive effect under Pennsylvania law if Transource should have raised its federal claims before the Commonwealth Court, but chose not to, the court cannot answer this question without impermissibly making a fact determination: whether Defendants objected to Transource's notice of its intent to split its claims. If Defendants did not object to Transource's announced intention to split its claims, "[t]hey cannot now benefit from their silence." Therefore, the court denies Defendants' motion to dismiss on claim preclusion grounds without prejudice to renewal at the summary judgment stage.

(Doc. 118, pp. 10–11 (quoting *R & J Holding*, 670 F.3d at 428.)

In making their argument, Defendants cite only their brief to the Commonwealth Court. (Doc. 148, p. 45–46; Doc. 147, ¶ 52; Doc. 147-9, pp. 55–68.) That is to say, they focus only on whether the PUC "objected to Transource's notice of its intent to split its claims" without providing facts or law to suggest that "Transource *should* have raised its federal claims before the Commonwealth Court."

Transource counters that Defendants' argument on claim preclusion fails for two reasons. First, it misunderstands the *England* doctrine—an exception to ordinary claim preclusion. (Doc. 158, p. 50.) Second, even applying Pennsylvania claim preclusion law, Transource's claims are not precluded because the Commonwealth Court expressly preserved Transource's ability to pursue its federal claims in this court and because the PUC acquiesced. (*Id.*)

Transource asserts that *England* reservation is an exception to the Full Faith and Credit Statute, 28 U.S.C. § 1738. (*Id.* (citing *Instructional Sys., Inc. v.*

*Comput. Curriculum Corp.*, 35 F.3d 813, 821–22 (3d Cir. 1994)).)  When *England* reservation applies, the state preclusion rules no longer apply to the at-issue state court decision.  (*See id.*)  *England* explicitly held that a party has waived its right to litigate federal claims in federal court if it "freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there."  *England*, 375 U.S. at 419.

In order to preserve its federal claims for resolution in federal court, a party need only "inform [the state] courts what his federal claims are, so that the state statute may be construed 'in light of' those claims."  *Id.* at 420.  Transource asserts that, under this standard, it properly reserved its federal arguments under *England*. Per *Pennhurst State School & Hospital v. Halderman*, it could not bring its state-law claims against Defendants, as state officials, in front of this court due to the Eleventh Amendment.  (Doc. 158, p. 51 (citing 465 U.S. 89 (1984)).)  But Transource brought its federal claims to this court and then its state claims in the Commonwealth Court.  (*Id.*)

Transource argues that, because it never "voluntarily" and "fully litigated [its] federal claims in the state courts," it should not be "denied [its] right to return to the District Court."  *England*, 375 U.S. at 421; Doc. 158, p. 51.  For that reason, the Commonwealth Court's judgement does not bar Transource's claim in this court.

Transource also addresses an argument that Defendants raised in their motion to dismiss, though not in the current cross-motions.  There, Defendants had argued that the validity of an *England* reservation was contingent on a defendant acquiescing to claim-splitting.  (Doc. 158, p. 53 (citing Doc. 118, pp. 9–10).)  Transource agrees that "defendant's acquiescence is one scenario in which claim-splitting is permitted under Pennsylvania law." (*Id.*)  But, because *England* reservation is an exception to the Full Faith and Credit Statute, when this exception applies, Pennsylvania law is irrelevant.  (*Id.*)

According to Transource, the Third Circuit explicitly rejected the proposition that a third party's actions are determinative in whether *England* reservation is effective.  (*Id.*)  Instead, "[i]t is the actions of the displaced litigant which are controlling." (*Id.* (quoting *Instructional Sys.*, 35 F.3d at 820–21) (citing *Kovats v. Rutgers*, 749 F.2d 1041, 1047 (3d Cir. 1984)).)  If consent of the opposing party were required, it would render as meaningless the *England* court's proclamation that reservation of federal claims for federal court is ineffective only when the litigant has "freely and without reservation litigated his federal claims in the state courts." (*Id.* (quoting *England*, 375 U.S. at 420).)

Transource also addresses two cases that Defendants raised at the motion to dismiss phase.  Specifically, it argues that, contrary to Defendants' assertions, *R & J Holding Co.* and *Bradley v. Pittsburgh Board of Education* do not stand for

24

the proposition that a defendant's acquiescence is required for an *England* reservation to be effective. (*Id.* at 54–55 (citing 670 F.3d 420; 913 F.2d 1064 (3d Cir. 1990)).) Instead, both cases hold only that an objection to an *England* reservation can be waived. (*Id.* at 55.)

Lastly, to the extent that this court held otherwise in its order denying Defendants' motion to dismiss, Transource points out that the court may reconsider. (*Id.* at 55–56.) As the Third Circuit has stated, "[i]nterlocutory orders . . . remain open to trial court reconsideration, and do not constitute the law of the case." (*Id.* at 55 (quoting *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017)).)

In response, Defendants argue that Transource's request for reconsideration is untimely under Local Rule 7.10. (Doc. 165, p. 24.) They next argue that Transource failed to properly invoke *England* reservation. They posit that *Bradley* stands for the proposition that *England* reservation must be invoked during the pendency of the state administrative proceeding. (*Id.*) They submit that Transource had to raise its *England* reservation with the PUC. (*Id.* at 24–25.)

Lastly, Defendants argue that the PUC did not acquiesce to Transource's *England* reservation. (*Id.* at 25–26.) Instead, pursuant to the Pennsylvania Rules of Appellate Procedure, which they assert apply here, Defendants objected to Transource's untimely *England* reservation at the earliest opportunity. (*Id.* at 25.)

Transource counters that its arguments are timely pursuant to the court's instructions to raise all issues in this case in the motions for summary judgment. (Doc. 168, p. 27.)  Next, Transource asserts that Defendants' argument that Transource had to invoke *England* in the PUC proceedings makes little sense.  (*Id.*)  Specifically, "it would have been nonsensical to make an *England* reservation" to the PUC because there was no federal claim until "*after* the PUC acted."  (*Id.*)

Transource argues that Defendants use *Bradley* to establish a principle that does not exist.  They point to the following passage from *Bradley*: "Under *England* a party who has been forced to litigate *in state court* may reserve its federal claims for federal adjudication by informing the state court of its reservation of those claims."  913 F.2d at 1071.  Transource argues that this quote shows that *England* pertains to parallel *court* proceedings which challenge state action.  (Doc. 168, p. 28.)  While the litigant in *Bradley* cited *England* in his administrative appeal, the Third Circuit in *Bradley* did not hold that he was "*required* to do so (rather than waiting until state court)."  (*Id.*)

In the alternative, to the extent that the litigant in *Bradley* was required to raise *England* during his administrative appeal, that is due to a factual distinction in *Bradley*.  (*Id.*)  There, administrative appeal provided the first stage of appellate review of the challenged state action.  (*Id.*)  Here, the PUC decision is the challenged state action.  (*Id.*)

Lastly, Transource argues that Defendants are wrong regarding their acquiescence in two ways.  (*Id.*)   First, it reasserts that Defendants acquiesced to *England* reservation.  Next, it argues that acquiescence is immaterial because, as stated in *England*, "[o]nce issue has been joined in the federal court, no party is entitled to insist, over another's objection, upon a binding state court determination of the federal question."  375 U.S. at 422 n.13.

Transource has the prevailing arguments on this issue.  *England* reservation is an exception to the Full Faith and Credit Statute.  *Instructional Sys.*, 35 F.3d at 821.  Defendants do not address this principle or the Third Circuit precedent of *Instructional Systems*.  Here, there is no dispute that Transource informed the Commonwealth Court about its federal claims.  There is similarly no dispute that Transource invoked *England* reservation at the Commonwealth Court.  And Defendants have not provided binding precedent which required Defendants to acquiesce in order for Transource to successfully invoke *England* reservation.  Further, this court will not deny Transource's arguments as untimely simply because Transource followed the court's explicit instructions regarding when to raise them.

Transource's analyses of Third Circuit and Supreme Court precedent are correct.  Defendants wish to stretch *Bradley* and *England* beyond their boundaries.  *Bradley* is an example of a case in which a party properly raised *England*

27

reservation throughout state administrative proceedings, but nowhere *requires* raising reservation at the administrative proceeding stage. And, in the present instance, Transource's federal claims arise from the PUC decision.

Defendants argue that, by bringing its dispute to the PUC, Transource without reservation submitted its federal claims for decision by state courts, thereby waiving its right to invoke *England*. (Doc. 165, pp. 24–25.) But Defendants do not sufficiently support their argument that Transource "without reservation submit[ed its] federal claims for decision" to the PUC. (*Id.*) Indeed, there is no evidence to which Defendants point to support their assertion that Transource submitted its federal claims to the PUC. Furthermore, this argument suggests that Transource was required to raise its federal claims with the PUC prior to the decision which gave rise to them. This simply makes no sense and Defendants have not cited any binding authority that supports this conclusion.

Moreover, Defendants fail to address *Instructional Systems* or *Kovats*, which show that Defendants were not required to acquiesce for Transource to invoke *England* reservation. Accordingly, Transource's federal claims are not precluded.

### 2. Issue preclusion does not apply.

Defendants, in a footnote in the brief in support of their motion for summary judgment, request the court reconsider its prior ruling on issue preclusion. (Doc. 148, pp. 5–6 n.1.) If the court will reconsider, Defendants request an opportunity

to provide supplemental briefing.  (*Id.*)  But, as noted above, in an on-the-record conference with counsel, and in response to a request for reconsideration, the court unambiguously instructed that "all of the issues in this case" should be "addressed in the summary judgment motions."  (Doc. 168-1, pp. 13–14.)

Defendants' request for reconsideration fails to follow the court's clear instruction.  Therefore, the court will not entertain this informal request.  Further, as Transource states, "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."  (Doc. 158, p. 58 (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).)  For this reason, Transource argues that Defendants have waived their issue preclusion argument.  Defendants do not address this argument in their subsequent briefs. Therefore, the court deems that Defendants have indeed waived any argument regarding issue preclusion.

## B. Merits Analysis

Transource argues that the PUC's denial of Transource's application conflicts with and is preempted by federal law.  (Doc. 158, pp. 23–42.)  In the alternative, Transource argues that the PUC's denial violates the dormant Commerce Clause in purpose and effect.  (*Id.* at 42–49.)

Defendants respond that the PUC's decision is neither preempted by federal law nor in violation of the dormant Commerce Clause.  Regarding preemption,

they argue that the PUC decision neither directly conflicts with federal law nor is it an obstacle to federal objectives.  (Doc. 165, pp. 8–18.)  Instead, it is a valid exercise of siting authority, which is a power that Congress reserved for the states. (*Id.* at 18–20.)  As for the dormant Commerce Clause, Defendants argue that the PUC decision neither discriminates against non-Pennsylvanians on its face, nor does it disproportionately burden interstate commerce.  (*Id.* at 20–23.) Defendants' arguments fail for the reasons explained below.

### 1.  The PUC's decision violates conflict preemption.

The Supremacy Clause of the Constitution provides that the Constitution and all laws "of the United States which shall be made in Pursuance thereof" are "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Consequently, courts "must not give effect to state laws that conflict with federal laws."  *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 324 (2015).  The Supremacy Clause "invalidates state law that interferes with or is contrary to federal law."  *Farina v. Nokia, Inc.*, 625 F.3d 97,115 (3d Cir. 2010).  As such, federal law may preempt state law in three ways.  *Id.* (citing *Free v. Bland*, 369 U.S. 663, 666 (1962)).  One of these is conflict preemption.  *Id.* (citing *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

Under Supreme Court precedent, conflict preemption arises where (1) "state and federal laws 'directly conflict,'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617

(2011), or where (2) "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal quotations omitted).  States cannot "regulate areas where FERC has properly exercised its jurisdiction" or create an "unavoidable conflict." *Oneok*, 575 U.S. at 386, 389.  Transource asserts that both types of conflict preemption are implicated in this dispute.  (Doc. 158, p. 27.)

Transource argues that the PUC's order conflicts head on with FERC's method of determining whether a project is needed.  Transource also submits that the PUC's decision is an obstacle to FERC's objective of creating transmission lines which reduce congestion, in turn reducing pricing disparities.  (*Id.*)  In effect, Transource argues, the PUC is vetoing the project because it "wants to preserve that very wholesale pricing disparity" the Project seeks to resolve.  (*Id.*)  If states could exercise that power, no lines would ever get built to reduce congestion, and FERC's regional planning efforts would be frustrated.  (*Id.*)

Transource points out that the Third Circuit has interpreted the Supreme Court's preemption case law as indicating that "regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *Farina*, 625 F.3d at 123. Transource argues that is exactly the situation here.

31

Transource observes that, under the "applicable federal standards imposed by FERC and implemented by PJM," there was a finding of a need for the Project. (Doc. 157-1, p. 58; Doc. 158, pp. 23–24; Doc. 164, ¶ 102.)  In spite of that determination, the PUC rejected the FERC-approved method for evaluating need and instead adopted an approach that FERC itself had rejected: one that counted as a project cost increased energy prices resulting from the reduced congestion that would follow.  (Doc. 157-1, p. 63.)[11]

Transource points out that the PUC's decision directly conflicts with the "FERC-approved method for determining whether a new transmission line is needed to reduce congestion on the interstate grid."  (Doc. 158, p. 24.)  It submits that such an approach is an obstacle to FERC's efficient regional planning.  (*Id.*) According to Transource, this situation is untenable: "If states could override FERC by applying a conflicting method for determining need, solely to preserve the benefits of congestion for their own citizens, that would eviscerate FERC's ability to plan the interstate transmission grid in an efficient and fair manner." (*Id.*)

---

[11] Defendants contest Transource's characterization insofar as it asserts that the PUC rejected FERC's analysis.  (Doc. 164, ¶ 105.) They instead rely on the PUC's statement that, according to Order 1000, the PUC is the decision maker.  (*Id.*)  On that basis, the PUC stated that its decision was "not influenced by FERC authority, directly or via PJM."  (*Id.*)

FERC has the power to regulate regional transmission planning. (*Id.* at 24 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d. 41, 55–64 (D.C. Cir. 2014)).) The FPA provides FERC the power to regulate "transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," and also "jurisdiction over all facilities for such transmission . . . of electric energy." §§ 824(a), (b). And courts, such as the D.C. Circuit, have held that the FPA provides FERC with "comprehensive and exclusive jurisdiction over the rates, terms, and conditions of service of the transmission and sale of wholesale electric energy in interstate commerce." *Ameren Ill. Co. v. FERC*, 58 F.4th 501, 502–03 (D.C. Cir. 2023) (citing *New York*, 535 U.S. at 7–8).

Transource asserts that FERC's powers over regional transmission planning stem from two sources: its authority over transmission of energy in interstate commerce and its requirement to ensure just and reasonable wholesale energy prices. (Doc. 158, p. 25.) Regarding the first, by ensuring adequate transmission capacity, FERC's regional transmission planning promotes reliability and efficiency. (*Id.*) And, as the D.C. Circuit has stated, "[e]nsuring the proper functioning of the interconnected grid spanning state lines . . . fits comfortably" within the FPA's "grant of jurisdiction over 'the transmission of electric energy in interstate commerce.'" *South Carolina*, 762 F.3d at 63.

As for the second, Transource observes that regional planning, which is used to address congestion in the interstate grid, is inextricably related to FERC's regulation of wholesale energy prices.[12]  (Doc. 158, p. 25.)  By reducing congestion, FERC ensures that all consumers throughout the grid have access to low-cost power plants in a way that is just and reasonable without being unduly discriminatory or preferential.  (*See id.*)

Transource points out that, in the 2008 FERC Order, FERC specified the approved method by which PJM would assess whether a project was needed to reduce persistent congestion.  123 FERC at 61,416.  PJM adopted the FERC-approved approach.  (Doc. 158 p. 26; Doc. 164, ¶¶ 36–42.)

Defendants counter that the PUC's decision neither directly conflicted with federal law nor was it an obstacle to Congress' objectives.  (Doc. 165, p. 8.)  The court will address these arguments in turn.

### i.  The court declines to rule on whether the PUC's decision conflicts with federal law.

Transource argues that, in adopting a methodology that directly conflicts with FERC's methodology, the PUC's order directly conflicted with federal law. The argument is that FERC determined the best approach for weighing the relative

---

[12] For example, Section 206(a) of the FPA, 16 U.S.C. § 824e(a), provides that whenever FERC "shall find that any rate, . . . for any transmission or sale subject to the jurisdiction of" FERC "is unjust, unreasonable, unduly discriminatory or preferential," FERC shall fix it.  And Order 1000 makes clear that congestion is a factor that causes such discriminatory or preferential rates, which FERC is required to fix.

costs and benefits of those transmission projects designed to reduce congestion. (Doc. 158, p. 28.) It chose an approach that did not consider an increase in prices resulting from that reduced congestion as a cost which should be weighed. (*Id.*; *see also* 2008 FERC Order, 123 FERC at 61,416.) In doing so, it determined that, in Transource's words, customers currently benefiting from persistent congestion had no entitlement to that benefit, which efficient transmission planning aims at mitigating. (*Id.*)

Quoting the Third Circuit decision in *Farina*, Transource argues that, in the present instance, FERC assessed the situation region-wide and applied its "reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives." 625 F.3d at 123. Accordingly, "[a]llowing state law to impose a different standard" would conflict with federal law through "re-balancing of those considerations." *Id.* For example, a "state-law standard that is more protective of one objective may result in a standard that is less protective of others." *Id.*

According to Transource, such is the case here, where the PUC expressly rejected the FERC-approved method for determining whether need exists for a congestion-solving transmission project. (Doc. 158, pp. 28–29.) The PUC stated that "potential negative and practical impact on the citizens and consumers of Pennsylvania [was its] concern." (Doc. 157-1, p. 63.) The PUC then adopted its

own methodology for determining "need" that conflicted with PJM's FERC-approved approach.

Transource points out that even Independent Market Monitor ("Market Monitor"), an organization which Defendants invoke and rely upon in critiquing the FERC-approved approach, acknowledges that the PUC's method directly conflicts with the FERC-approved approach.  (Doc. 164, ¶ 53; *see* Doc. 148, pp. 16, 18.)  Not only had FERC not agreed with or adopted the approach, after Market Monitor repeatedly proposed it, the approach is "irreconcilable" with the methodology that FERC did approve.  (Doc. 164, ¶¶ 47–51, 53–54.)

Transource urges that the court should apply here the same analysis from the Supreme Court's decision in *Nantahala Power & Light Co. v. Thornburg*, 475 U.S. 953 (1986).  (Doc. 158, p. 30.)  The Court in *Nantahala* determined that a state utility commission could not apply a cost-allocation method that conflicted with FERC's decision.  475 U.S. 966–67.  It held that "Once FERC sets . . . a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable.  A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority."  (Doc. 158, p. 30 (quoting 475 U.S. at 966).)  Transource argues that *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988), similarly applies and requires the court to

36

conclude, once FERC has approved a method in an area in which it exercises authority, a state may not adopt a conflicting method. (*Id.*)

Transource argues that these preemption principles are not limited to scenarios in which utility commissions disregard FERC-filed rates. They are equally applicable where a utility commission undertakes "identical, independent inquiries regarding [a project's] merits" but take a "perspective of different public interests," and as a result "reach conflicting conclusions." (*Id.* at 31 (quoting *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.* 812 F.2d 898, 905 (4th Cir. 1987)).) Such is the case here, according to Transource.

Transource points out that it is unaware of any instance in which a state has directly disregarded FERC-approved regional planning methodology in the same way as the PUC. (*Id.*) In Maryland, the Maryland Public Service Commission rejected an argument similar to that which the PUC accepted. It determined that it was "of no consequence" that the Project failed to meet the benefit-cost ratio when examined at the Maryland level. *In re Application of Transource Maryland LLC*, No. 9471, 2020 WL 3977589, at *41 (¶142) (Md. Pub. Serv. Comm'n June 30, 2020). Instead, it determined that, "pursuant to FERC Order No. 1000 and PJM's Tariff—[the Project] must be evaluated on a regional, not on a state-specific basis." *Id.*

Defendants provide a single argument to refute Transource's assertion that the PUC's decision conflicts with federal law. They point out that the cases on which Transource relies, *Nantahala*, *Mississippi Power & Light*, and *Appalachian Power*, all relate to FERC's ratemaking authority. (Doc. 165, p. 15.) They assert that these cases are inapposite because the instant action relates instead to FERC's authority over interstate electric transmission planning and not to ratemaking. (*Id.* at 15 & n.4.) Defendants cite no precedent in support of this distinction.

Although Transource has provided a well-reasoned argument, no binding precedent is directly on point. Defendants are correct that the cases Transource cites all relate to FERC's ratemaking authority. It is true that cases such as *Nantahala*, make clear that a state's actions need not precisely be ratemaking in order to interfere with FERC's rate-making authority. 476 U.S. at 966. Indeed, the Supreme Court held that "[a] State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Id.* In doing so, it explained that "the filed rate doctrine is not limited to 'rates' *per se*." *See id.* at 967 ("[O]ur inquiry is not at an end because the orders do not deal in terms of prices or volumes of purchases.") (citation omitted).

Yet, in each of these cases, there was an exceedingly close nexus between the action of the state utility commission and the exercise of FERC's ratemaking

powers.  Although Transource urges that the same analysis should be applied to its

regional transmission planning authority, it provides no federal appellate authority

to support that assertion.  (Doc. 158, pp. 30–31.)

Transource may be correct that the PUC's decision does directly conflict

with federal law.  But because the court concludes that the PUC's decision was

conflict preempted for other reasons and also violated the dormant Commerce

Clause, the court declines to rule on whether the decision directly conflicted with

federal law since a ruling on this argument is not necessary to the resolution of the

instant motion.

### ii.  The PUC's order is an obstacle to federal objectives.

Transource also maintains that the PUC's decision is an obstacle to federal

objectives.  (*Id.* at 32–33.)  It points out that, by the very nature of building new

transmission lines to reduce congestion, wholesale energy rates will go down in

some areas and up in others—that is the entire purpose of such projects.  (*Id.* at

32.)  If a state could decide that disagreement with the FERC-approved

methodology underlying such projects was a permissible reason to deny siting

approval, then FERC's regulatory scheme would be obstructed.  (*Id.*)  Congestion-

reducing projects would become nearly impossible to build because those states

currently benefitting from congestion could simply deem the proposed projects as

unnecessary.  (*Id.*)

Transource views this outcome as untenable. It would contrast with the PUC's own admission that "States . . . carry[ing] out their individual State jurisdictional responsibilities . . . cannot interfere with the national goals of creating a strong and fair wholesale energy market." (*Id.*; Doc. 164, ¶ 56; Doc. 157-22, p. 16.) Transource argues that Pennsylvania may not reap the benefits from federal planning when it suits Pennsylvanians, but obstruct federal planning needed to reduce persistent interstate congestion. (Doc. 158, pp. 32–33.)

Defendants counter that the PUC's decision was not an obstacle to Congress' objectives. (Doc. 165, p. 8.) In furtherance of this argument, they contest the existence of the underlying congestion and alleged pricing disparity between Pennsylvania and other states. (*Id.* at 16.) Then they point to the Commonwealth Court opinion which, they assert, specifically held that the congestion–the existence of which they dispute–has decreased since 2014. (*Id.*) They also argue that Transource has failed to provide any evidence of pricing disparities resulting from said congestion. (*Id.*)

Defendants assert that Transource is incorrect in its assertion that congestion remediation is the applicable federal objective. (*See id.*) Instead, the real goal was the creation of a transmission plan, which was created when the Project was submitted to the RTEP. (*Id.*) Because the PUC did not interfere with that step of

40

the process, it is in essence incapable of now creating obstacles to federal objectives, which have been entirely achieved.  (*See id.*)

In short, Defendants' argument is that the only federal objective at play in this dispute is for PJM to create an essentially academic plan to solve a problem that–in Defendants' view–does not actually exist.  Once the plan has been created, the federal objective has been met and federal interests have been satisfied.  The only legal authority Defendants include to support their argument is the Commonwealth Court's finding that congestion has decreased since 2014, Third Circuit precedent related to the summary judgment standard, and a passing unexplained citation to purportedly assert *res judicata*.  (*See* Doc. 165, pp. 15–18.)

The court finds Defendants' arguments to be unsupported and unconvincing. It is undisputed that RTOs like PJM are responsible for "planning, and [] directing or arranging, necessary transmission expansions, additions, and upgrades that will enable it to provide efficient, reliable and non-discriminatory transmission service and coordinate such efforts with the appropriate state authorities."  18 C.F.R. § 35.34(k)(7).  As such, PJM "must encourage market-driven operating and investment actions for preventing and relieving congestion."  *Id.* at § 35.34(k)(7)(i).  The apparent preliminary goal of regulations such as these and the 2008 FERC Order was for PJM to analyze and select congestion-reducing projects with benefits that exceed their costs by the required ratio.  The ultimate

41

goal is that such projects be built if they obtain the necessary state siting, construction, and permitting approvals, in order to remove the obstacle of congestion and thus achieve FERC's duty of ensuring that wholesale rates are just and reasonable.

Here, by disagreeing with PJM's FERC-approved benefit-cost methodology, the PUC seeks to undercut the foundational goal of congestion-alleviating projects. The PUC insists that any benefit-cost ratio must include projected rate increases for areas that currently benefit from congestion—areas which will not contribute to payment for the Project. This directly contradicts PJM's FERC-approved tariff.[13] Furthermore, the PUC implicitly assumes that congestion-reduction is not a valid goal in its own right.

It is clear that FERC has determined that regional congestion is a problem and one that directly affects its core obligation of ensuring just and reasonable electric rates. As such, it is not within the PUC's purview to pose obstacles to FERC's pursuit of reducing congestion through its approval process. Nor is it

---

[13] As the Third Circuit has explained, a "tariff" is "the term of art used to refer to the 'classifications, practices, and regulations' a public utility uses to establish electricity rates." *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 83 (3d Cir. 2014) (citing 16 U.S.C. § 824d(c)). Once a tariff has been filed with FERC and approved, either explicitly by FERC or by operation of law, it has the force of federal law. *See Mississippi Power & Light*, 487 U.S. at 373; *PJM Power Providers Grp. v. FERC*, Nos. 21-3068, 21-3205 & 21-3243, at *35 (3d Cir. Dec. 1, 2023) ("Congress established in § 205(d), and underscored in § 205(g), that a tariff may change by operation of law [.]").

within the PUC's authority to pose obstacles to this federal objective when PJM

pursues it under the auspices of a FERC-approved tariff.

Defendants' arguments about the merits of PJM's congestion analysis and

how the Project should be assessed do them no favors in this legal context. These

arguments only underscore the extent to which the PUC's decision constitutes an

obstacle to FERC achieving its goals of reducing congestion and achieving just and

reasonable rates. The PUC is attempting to supplant the role of the RTO and

expand its state authority into the regulatory territory occupied by the federal

government. If permitted, the PUC's second-guessing of the methods sanctioned

by federal law and employed by the RTO would severely handicap the ability of

FERC to ensure just and reasonable rates. Because the PUC's decision presents an

obstacle to achieving federal objectives, it is conflict preempted and violates the

Supremacy Clause.

### iii. Congress' explicit preemption in FPA § 216 does not diminish the existence of conflict preemption here.[14]

Defendants argue that Congress has shown in the FPA that it is aware of the language required to preempt traditional authority and has not done so in this instance. (Doc. 148, pp. 34–35.)  Section 216 applies to congestion projects in areas which the Secretary of Energy has designated as national interest electric transmission corridors.  (*Id.* at 34 (citing 16 U.S.C. § 824P(a)).)  Through § 216, the FPA provides a mechanism by which FERC may grant a permit to develop a congestion project despite a state commission denying the application. (*Id.* (citing §§ 824p(a), (b)(1)(C)(iii)).)

By contrast, FERC made clear that "nothing in" Order 1000 was "intended to leverage the regional transmission planning or interregional transmission coordination reforms to exceed [FERC]'s section 216 backstop authority."  Order 1000-A, 77 Fed. Reg. at 32,215 n.248.  But, according to Defendants, that is exactly what Transource is arguing for.  (Doc. 148, p. 35.)

---

[14] In Defendants' initial brief, they also argue that FERC lacks the statutory authority to preempt the PUC decision.  (Doc. 148, pp. 30–32.)  They argue that where, as here, a state authority conflicts with, and thus has been displaced by, the existence of Federal Government authority," a "presumption against pre-emption" applies.  (*Id.* at 31–31 (quoting *New York*, 535 U.S. at 17–18).)  But Transource points out that the anti-pre-emption presumption applies to areas traditionally regulated by the states.  (Doc. 158, p. 37.)  States have not traditionally regulated interstate transmission planning.  (*Id.*)  Transource points out that Defendants identify no case holding to the contrary.  And Defendants do not respond to Transource's arguments in their reply.  Transource has the better argument on this point, too.

Transource disagrees.  It is not asserting that FERC has the authority to permit the Project in the face of a valid PUC denial.  (Doc. 158, p. 39.)  It acknowledges that the Project is not in a national interest electric transmission corridor, and FERC therefore has no authority to issue a construction permit.  (*Id.*)  Instead, the issue at hand is whether the PUC may rely on its siting authority to "override a FERC-approved method for determining whether a line is needed to reduce interstate congestion."  (*Id.*)

The court agrees with Transource that Defendants' argument mischaracterizes the issue in this case.  The preemption question before the court does not pertain to whether FERC may override an otherwise valid PUC decision related to Transource's application or the Project at large.  Instead, the issue relates to whether the PUC decision was an obstacle to achieving federal objectives.  Thus, Congress' express preemption in § 216 does not undermine Transource's conflict preemption argument.

### iv. The PUC's decision was not an exercise in siting.

Defendants also argue that the PUC's decision was not preempted because it was a valid exercise of a power which Transource concedes was reserved for the states: siting authority.  (Doc. 165, p. 18–20.)  While Defendants concede that FERC had jurisdiction over transmission planning, they argue that the PUC's decision constituted an exercise of its siting authority, a power which Congress has

left exclusively to the states.  (*Id.* at 9.)  Invoking a FERC order, they assert that

"[i]t is well-settled that [FERC] does not have authority over the siting and

construction of electric transmission facilities.  (*Id.* (quoting *PacifiCorp*, 72 FERC

¶ 61,087, 61,488 (1995)).)  Instead, "[a]ll such matters should be resolved at the

state and local level." *PacifiCorp*, 72 FERC at 61,488.  Courts have found that

"states have traditionally assumed all jurisdiction to approve or deny permits for

the siting and construction of electric transmission facilities." *Piedmont Envtl.*

*Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009).

According to Defendants, the distinction between transmission planning and

siting is based on the sequence of decisions.  (Doc. 165, p. 9.)  They invoke Order

1000, in which FERC stated that, "[t]ransmission planning is a process that occurs

prior to the interconnection and coordination of transmission facilities.  76 Fed.

Reg. at 49,860.  Defendants submit that transmission planning, therefore, "ends

entirely before any coordination of utility transmission facilities occurs, *i.e.*,

building and connecting new transmission lines to the existing grid." (Doc. 165,

p. 9.)

Defendants concede that, pursuant to Order 1000, FERC has determined that

the order's "transmission planning and cost allocation requirements . . . are

associated with the processes used to identify and evaluate transmission system

needs and potential solutions to those needs." (*Id.* (citation omitted).)  But, by the

language of Order 1000, nothing in it "requires that a facility in a regional transmission plan or selected in a regional transmission plan for purposes of cost allocation be built, nor does it give any entity permission to build a facility." 76 Fed. Reg. at 49,854.

Defendants assert that, although transmission planning has narrow objectives, siting and permitting a project involve "a broader inquiry into the public interest 'need' for the project." (Doc. 165, p. 10.)  In making this assertion, Defendants do not quote any federal law or interpretation thereof.  They instead invoke the PUC's assessment of the Pennsylvania law which it applied in assessing Transource's permit.  (*Id.* at 10–11.)  Defendants assert that the PUC's determination was based on "the weight of all the evidence" to determine whether the Project is "reasonable and necessary and in the public interest" in order "to determine whether Transource has established need" for "approval of the siting" of the Project.  (Doc. 165, pp. 10–11 (quoting Doc. 1-2, p. 60.)

Applying that standard, the PUC determined that there was insufficient need for the Project.  (*Id.* at 11.)  The factors they considered included the fact that congestion had decreased over the APSRI since the initial study showing need and "there was insufficient proof of the potential NERC reliability violations."[15]  (*Id.*)

---

[15] Defendants' point is that the FERC-approved regional transmission planning is deficient. They do not define the term "NERC," which stands for North American Electric Reliability Council.  (Doc. 90-1, p. 4.)

Defendants assert that the PUC's application of Pennsylvania law was in compliance with "the standard FERC applies when it exercises its 'backstop' siting and permitting authority under FPA Section 216." (*Id.* (footnote omitted).)

In determining the appropriate process regarding § 216 projects, "a commenter proposed that FERC 'rebuttably presume a need for a project subject to the independent oversight'" because "participants must already make showings of local or regional needs to gain approval from an [] RTO." (*Id.* (quoting *Regulations for Filing Applications for Permits to Site Interstate Electric Transmission Facilities*, 117 FERC ¶ 61,202, at *10 (2006)).) FERC did not take this approach, and instead found that "determinations of an [RTO] should be given due weight in [FERC's] assessment of whether a particular facility is needed to protect or benefit customers." 117 FERC ¶ 61,202 at *10–11. Accordingly, FERC would "consider any such independent determinations as a factor, along with all other relevant factors, in determining whether the statutory criteria have been met." *Id.* Defendants argue that is exactly what the PUC did here. (Doc. 165, p. 12.)

The court finds this argument unconvincing. Defendants suggest that the PUC, by adopting FERC's approach to determining the need for a particular project, is not interfering with FERC's authority. But Defendants have provided no authority to suggest that public utility commissions are meant to exercise

---

parallel functions as FERC.  Therefore, Defendants have not persuaded the court that, by mirroring FERC'S approach to the determination of whether a project is needed, the PUC's decision is somehow not an obstacle to federal objectives.

Defendants also argue that the PUC's decision related to siting, and not regional planning, because it was procedurally different from PJM's transmission planning process.  (*Id.* at 12–14.)  In support of this argument, they point to various ways in which PJM's process was purportedly faulty, whether by not conducting evidentiary hearings, taking sworn testimony, permitting cross-examination, or purportedly basing the benefit-to-cost analysis on stale information.  (*Id.*)  Meanwhile, the PUC's determination was based on timely information which provides, in Defendants' words, "an important procedural check on the un-litigated, un-reviewed conclusions reached by PJM."  (*Id.* at 13.)

If they were not allowed this important procedural check, Defendants argue, state laws would merely be a "rubber-stamp [of] every RTO-approved transmission line application."  (*Id.* at 14 (internal quotation marks omitted).)  Defendants argue that the court need not parse the meaning of FERC's instructions in Order 1000 "because FERC has clearly instructed that its jurisdiction did not reach siting and permitting."  (*Id.*)  Here, the PUC's decision was made "***after*** the transmission planning process was completed.  The PUC decision, therefore, was a valid exercise of its siting authority."  (*Id.*)

Transource responds that, although federal law reserves siting and permitting authority for the states, that authority does not support the PUC's decision. It asserts that the PUC's decision "was not a siting decision, even though it was made in the context of reviewing a siting proceeding. Rather, it was a planning decision." (Doc. 158, p. 33.) In support of this position, Transource invokes Supreme Court precedent, which held that "[i]n a pre-emption case, . . . a proper analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013).

Transource argues that this is indisputably a planning decision in substance, as observed by the fact that FERC had the power to approve PJM's tariff on the issue. (Doc. 158, p. 33.) By contrast, if it were actually a siting issue, FERC would have lacked the authority to evaluate the issue, as it has no authority regarding siting. (*Id.* at 33–34.) But, as FERC state in Order 1000, "transmission planning . . . requirements . . . are associated with the processes used to identify and evaluate transmission system needs and potential solutions to those needs." Order 1000, 76 Fed. Reg. at 49,861. But the identification of these needs and solutions "in no way involves an exercise of authority over those specific substantive matters traditionally reserved to the states," like siting. *Id.* Transource

further points out that none of the authorities cited by Defendants held that a decision like the PUC's was a siting decision. (Doc. 158, p. 34.)

Transource concedes that nothing requires the PUC to site a project or a approve one merely because FERC approves it. (*Id.* at 34–35.) But then Transource maintains that its concession is immaterial—Transource is not asserting that the PUC must allow the project to be built in a specific place. (*Id.* at 35.) Instead, it is asserting that, although the PUC may deny projects for siting reasons, such as to "mitigate the impacts of construction on public health and safety, the environment, and natural resources," it may not deny them on the basis of regional planning, which is reserved for FERC. (*Id.*)

Transource also concedes that the PUC could have legitimately denied its application based on a siting decision. (*Id.*) The PUC could have done so based on any number of factors. For example, it may "evaluate the route over which the transmission line will traverse, and impose requirements to mitigate the impacts of construction on public health and safety, the environment, and natural resources." (*Id.*) But Transource contends that the PUC may not use these factors as a pretext for denying permission because it disagrees as to whether congestion needs to be relieved. (*Id.* at 35 n.3.)

Defendants maintain that the PUC's decision was, indeed, an exercise of its *siting* authority. (Doc. 165, p. 9–14.) In support, they look to when in the

Project's timeline the PUC's decision occurred.  As FERC has stated,

"[t]ransmission planning is a process that occurs prior to the interconnection and

coordination of transmission facilities."  (*Id.* at 9 (quoting Order 1000, 76 Fed.

Reg. at 49,861).)  Further, it "does not create any obligations to interconnect or

operate in any certain way."  (*Id.* (quoting Order 1000, 76 Fed. Reg. at 49,861).)  It

asserts that transmission planning occurs entirely before any "coordination of

utility transmission facilities occurs, i.e., building and connecting new transmission

lines to the existing grid."  (*Id.* at 9–10 (footnote omitted).)

Defendants assert, without support, that although transmission planning has

the narrow objectives of "identifying potential solutions to transmission issues and

allocating projected costs of those solutions—siting and permitting a project

involves a broader inquiry into the public interest 'need' for the project."  (Doc.

165, p. 10.)  In accordance with Defendants' asserted broader inquiry, the PUC

followed the process mandated by Pennsylvania statute.  (*Id.* 10–11.)

Defendants further urge that, "[g]iven the FPA's dual regulatory scheme,

conflict-pre-emption analysis must be applied sensitively in this area, so as to

prevent the diminution of the role Congress reserved to the States while at the

same time preserving the federal role."  (Doc. 165, p. 8 (quoting *Coal. for*

*Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 55 (2d Cir. 2018)).)

After carefully considering Defendants' arguments, the court is not persuaded that the PUC's decision was, in substance, about siting. Much of Defendants' argument attempts to deconstruct PJM's analysis, following FERC-approved methodology, for assessing the Project. (*See id.* at 11–14.) Defendants' argument picks apart the FERC-approved methodology and whether it was sufficiently open, allowed for evidentiary hearings, permitted cross-examination, or allowed argument by interested parties. (*Id.* at 12–13.) But in making these arguments about the various flaws in PJM's analysis of the need for the Project, Defendants have not provided a substantive basis for this court to conclude that the PUC's decision actually related to *siting* as opposed to determining whether there was a need for the Project.

Instead, the court is convinced that the PUC's decision was, in fact, a substantive determination of need in the form of an exercise of siting authority. The court finds two facts important in this determination. The first is that the PUC's analysis in denying Transource's application clearly overlaps with PJM's regional transmission planning analysis. That analysis was undisputedly regional transmission planning when FERC approved it and PJM carried it out. Why should it be something else when the PUC does the same kind of analysis?

Second, no party has presented any evidence or compelling law to suggest that the PUC's decision related to "siting" as the term is commonly understood.

The Oxford English Dictionary defines "siting" as "[t]he action of locating

something in a particular place." *Siting*, *Oxford Dictionaries*,

https://premium.oxforddictionaries.com/us/definition/american_english/siting (last

visited Nov. 6, 2023).  But the PUC's denial was not related to the particular place

of the Project.

The court is not convinced by Defendants' sequence-based argument that

siting follows regional transmission planning and therefore anything that occurs

sequentially after the regional transmission plan is, therefore, siting.  Rather, as the

Supreme Court has noted, in assessing preemption, "a proper analysis requires

consideration of what the state law in fact does, not how the litigant might choose

to describe it."  *Wos.*, 568 U.S. at 637.  Although the PUC now terms its denial as

an exercise of siting authority, it was regional transmission planning in reality.

That is the case even if though it occurred after PJM approved the Project.

Because Defendants have failed to show that the PUC decision was a valid

exercise of its siting authority, Defendants fail to overcome the preemption

analysis.

### 2. The PUC's decision violates the dormant Commerce Clause.

The Constitution's Commerce Clause provides Congress the power to "regulate commerce . . . among the several States."  U.S. Const. art I, § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause as containing a "dormant" component that "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 98 (1994).  The dormant Commerce Clause "prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-state interests' expense."  *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002) ("*Cloverland I*").

There are two ways in which the dormant Commerce Clause invalidates state regulation.  First, where a state regulation is "motivated by simple economic protectionism," it will be "subject to a virtually *per se* rule of invalidity, which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose."  *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007).  This heightened scrutiny will apply where a state acts with "discriminatory purpose," *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984), or the regulation "discriminates against interstate commerce 'either on its face or in practical effect.'" *Cloverland I*, 298 F.3d at 210–

11.  Under this rule, "[t]he party challenging the [law] has the burden of proving the existence of such discrimination."  *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 261 (3d Cir. 2006) ("*Cloverland II*").  If there is discrimination, the state is required to show that the law is narrowly tailored to "advance a legitimate purpose."  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008).

If heightened scrutiny does not apply, the *Pike* balancing test applies.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  Under this test, an "even-handed" regulation that "incidentally" burdens interstate commerce will be found valid unless the burdens are "clearly excessive in relation to the putative local benefits." *Cloverland I*, 298 F.3d at 211.

Transource argues that the PUC's decision fails whether analyzed under the *per se* test or *Pike*.  (Doc. 158, p. 43.)  It fails the *per se* test because it discriminates on its face against interstate commerce.  (*Id.*)  Quite simply, the PUC denied the Project because the PUC wished to maintain low prices for Pennsylvania customers that benefit from congestion.  (*Id.*)

Transource also argues that, even if the *Pike* test applies, the Defendants fail because the PUC's decision burdens interstate commerce by preventing the alleviation of congestion across state lines.  (Doc. 158, p. 46.)  Transource observes that, when assessing burdens on interstate commerce, a court must

evaluate not only the instant burden, "but also by considering how the challenged [regime] may interact with the legitimate regulatory regimes . . . if not one, but many or every, State adopted [a] similar [regime]." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 337 (1989).

On the other hand, Defendants argue there are three reasons why the PUC's decision does not amount to a *per se* violation of the dormant Commerce Clause. First, Defendants reason that although some Pennsylvanians would pay more if the Project were completed, others would benefit.  The PUC's decision was not an attempt to benefit Pennsylvanians to the detriment of others, instead it was a holistic regional analysis.  (Doc. 148, p. 42.)

Next, Defendants argue that the PUC's decision was "not local protectionism but the very essence of state sovereignty."  (*Id.* at 42–43 (citing *Piedmont*, 558 F.3d at 314–15).)  Defendants argue this is distinct from other cases which Transource cites, like *New England Power Co. v. New Hampshire*, because that case did not relate to the constitutionality of a state regulation preventing the construction of a utility facility on public land.  (*Id.* at 43 n.5 (citing 455 U.S. 331 (1982)).)  Defendants do not explain the significance of this factual distinction.  On this point, Defendants also dispute whether congestion or price disparities actually exist.  (*Id.* at 43–44.)

Finally, Defendants argue that the PUC decision does not burden interstate commerce because it takes into account "all the costs and benefits" of the Project, including "considerable increases in prices to ratepayers both in Pennsylvania and elsewhere" in the region.  (Doc. 148, p. 44.)  By contrast, they argue that PJM applied "local, parochial interests" when assessing the benefits and costs of the Project.  (*Id.* at 45.)

In response, Transource argues that Defendants' arguments are meritless. Where Defendants argue that the PUC enacted a region-wide assessment that was not self-serving, the record disproves this assertion.  (Doc. 158, pp. 47–48.)  And, Transource maintains that it is irrelevant under the dormant Commerce Clause whether residents of other states incidentally benefit from the PUC's protectionist approach.  (*Id.* at 48 (citing *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 349, 350–54 (1977)).)  In further support, Transource cites numerous Supreme Court cases.  (*See id.* at 48–49.)[16]

Lastly, Transource argues that the PUC's allegation that no pricing disparity exists due to congestion, does not save them from the dormant Commerce Clause.

---

[16] Defendants argue that none of these cases apply because "each deals with the sale of goods that are already in existence within the stream of interstate commerce."  (Doc. 165, p. 22.)  By contrast, Defendants assert that this case is about "the construction of a new utility line not currently in existence."  (*Id.*)  Defendants provide no legal support for this analytical distinction. In any event, the court finds it unconvincing.  While this case is about the denial of a permit for new transmission lines, the underlying issue is the flow of electricity across state lines. Electricity already existed and was already in the stream of commerce.

(*Id.* at 49.)  It points out that the PUC's own findings recognized higher prices in Maryland, Virginia, and D.C. due to congestion.  (*Id.*)  The PUC also recognized that the Project would benefit customers region-wide by reducing congestion, but Pennsylvanians would overall pay higher prices due to the reduced congestion. (*Id.*)

Transource likens the PUC's decision to *New England Power*, in which the Supreme Court held that the "order of the New Hampshire Commission, prohibiting New England Power from selling its hydroelectric energy outside the State of New Hampshire, is precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states."  455 U.S. at 339.  In that case, the utility commission issued its order to benefit citizens of New Hampshire to the detriment of those in neighboring states who could not have access to the low-cost power.  *Id.*[17]

Reviewing the PUC's decision, it is clear that the PUC determined that "the consequences of [the Project] would be to alleviate the economic congestion on a regional level, which in turn would result in higher rates in Pennsylvania."  (Doc. 157-1, p. 63.)  Regardless of the regional benefits of the Project, the PUC

---

[17] Transource recognizes that in *New England Power*, the problematic conduct was attributed to a state statute, whereas here the PUC's decision is based on a denial stemming from the application of a state regulation.  (Doc. 158, p. 45 n.8.)  But Transource asserts that the distinction makes no difference.  (*Id.* (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992).)  Defendants do not respond to this argument.

determined that the "potential negative and practical impact on the citizens and consumers of Pennsylvania is our concern." (*Id.*)

Here, the court finds that the PUC's decision was a per se violation of the dormant Commerce Clause driven by economic protectionism. Although various statements by the PUC place greater emphasis on Pennsylvania interests and others place more emphasis on regional interests, the PUC's own words make clear that it was focused on protecting the interests of Pennsylvanians. Importantly, the very nature of the Project is to improve the flow of wholesale electricity across state lines to places that currently have less access and therefore higher prices. The Project's sole purpose is to better facilitate commerce across regional and state boundaries. And the PUC's opposition to the Project is rooted in economic protectionism in the form of maintaining the status quo imbalance of access to low-priced electricity.

The court recognizes that the PUC also asserts that congestion may not even exist and the Project may not alleviate it. Even assuming that this argument has relevance to the dormant Commerce Clause analysis, neither assertion holds up based on the PUC's own analysis. The PUC contends that Pennsylvanians (and others), who will not be paying the costs of building the Project, will pay higher rates if the Project is completed. That contention is premised on two assumptions. The first is that congestion exists. The second is that the Project, by reducing

congestion, will increase prices for those currently benefitting from congestion. Accordingly, the PUC's own analysis defeats the argument it raises in this case that congestion did not exist and the Project would not solve it.

Although this finding of a *per se* violation is supported by the PUC's own language in its decision, the court also makes the same finding based on the practical effect of the PUC decision. By insisting on counting as a Project cost the projected increase in pricing to those who currently benefit from congestion, the PUC's decision recognizes congestion as a benefit. That is, it determines that similar access to low-cost electricity is only desirable to the extent that it does not raise prices to those who currently benefit from congestion. Thus, the court concludes that Transource has met its burden in proving the existence of discrimination.

Having made that finding, the state is now required to show that the law is narrowly tailored to "advance a legitimate purpose." *United Haulers*, 550 U.S. at 338–39. Defendants' arguments focus on whether there was a *per se* violation or whether the PUC's decision burdens interstate commerce. But they do not assert a legitimate local purpose. Because they fail to do so, they cannot show that the PUC decision is narrowly tailored to advance such a purpose.

The court also notes that the PUC's decision would violate the dormant Commerce Clause under *Pike*. In accordance with *Healy*, the court concludes that,

if other states adopted a regime similar to the PUC, it would eviscerate FERC's attempts to reduce congestion.  Instead, each state could put forth its own analysis and effectively deploy a veto as to whether regional transmission projects were desirable as congestion-reducing projects.

For these reasons, the PUC's decision violated the dormant Commerce Clause.

CONCLUSION

For the reasons explained above, the court finds that the PUC's decision violated the Supremacy Clause and the dormant Commerce Clause.  Based on these findings, the court will deny Defendants' motion for summary judgment and grant Transource's motion for summary judgment.  (Docs. 146, 156.)  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated:        December 6, 2023